THE ZANESVILLE INVESTMENT COMPANY AND AFFILIATES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86058. Filed June 25, 1962.

*Lawrence D. Stanley, Esq.,* and *John A. Dunkel, Esq.,* for the petitioner.

*John J. Larkin, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the petitioner's income tax as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1949 | $2,992.09 | 1954 | $41,489.50 |
| 1950 | 3,438.65 | 1955 | 93,648.48 |
| 1951 | 2,938.09 | 1956 | 88,597.76 |
| 1952 |  | 1957 | 86,924.20 |
| 1953 | 2,141.33 | 1958 | 70,151.66 |

The parties have reached agreement on several of the issues for the years 1949 through 1958 and have stipulated to that effect; the years 1949, 1950, 1951, 1953, and 1954 are no longer involved here. The only remaining issue is whether the petitioner in its consolidated income tax returns filed for its affiliated group in 1955 and 1956 is entitled to deductions for the post acquisition losses incurred in those years by a newly acquired subsidiary, the Muskingum Coal Company, or whether such deductions are disallowed by section 269 of the Internal Revenue Code of 1954.[1] The years 1957 and 1958 are involved because of the disallowance by respondent of the carryover of these losses to the later years.

### FINDINGS OF FACT.

Some of the facts were stipulated and they are herein included by this reference.

The Zanesville Investment Company, hereinafter called petitioner, is an Ohio corporation organized August 24, 1940, with its principal office in Zanesville, Ohio. The consolidated income tax returns of petitioner and its affiliates for the years here involved were filed with the then collector of internal revenue or the district director of internal revenue at Columbus, Ohio (now Cincinnati, Ohio).

Petitioner filed consolidated income tax returns for the years 1949 through 1954 with Earl J. Jones Enterprises, Inc. (hereinafter called

---

[1] All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

Enterprises), and Bailey's-On-Main, Inc., and for the years 1955 through 1958 petitioner filed consolidated returns with Enterprises, the Muskingum Coal Company, hereinafter called Muskingum, and Muskingum's subsidiary, Jones Motor Sales, Inc. Earl J. Jones was president of the petitioner from 1943 until his death in December 1957. As of February 28, 1948, Jones owned all of the issued 2,390 shares of stock of petitioner.

From March 1, 1944, until at least March 16, 1959, the petitioner owned 501 of the 505 issued shares of Enterprises, an Ohio corporation organized in 1939. Jones was president of Enterprises from 1939 until the date of his death. From about 1939 to 1954 Enterprises published a newspaper in Zanesville. Petitioner owned the building and equipment used by Enterprises to publish the newspaper. In 1954 the newspaper was discontinued by Enterprises and its goodwill sold to another newspaper, and in the same year petitioner sold the machinery and equipment. Enterprises also published a newspaper in Massillon, Ohio, and owned the real estate and plant used to publish this newspaper.

Muskingum was organized in 1923 under the laws of the State of Ohio and during all the period here involved was engaged in the business of mining coal in the vicinity of Zanesville. From May 31, 1945, until September 1, 1955, Jones owned 1,197 of the issued 2,000 shares of common stock of Muskingum. Muskingum held 801 shares of common stock from May 31, 1945, as treasury stock. During the years 1954, 1955, and 1956 (through July) there were 70 shares of 7-percent preferred stock outstanding which were not owned by Jones. Jones was president of Muskingum from 1937 until about the middle of 1956.

In December 1944 Muskingum started work on a new mine called the Misco Mine, hereinafter called Misco No. 1. Production at Misco No. 1 commenced on March 1, 1945, and continued through April 1955. Muskingum's net income (or loss) from Misco No. 1 over this period was as follows:

| Year | Net income | Year | Net income |
|------|-----------|------|-----------|
| Mar. 1–Dec. 31, 1945 | $570,411.99 | 1951 | ($223,684.43) |
| 1946 | 1,049,857.33 | 1952 | (263,111.38) |
| 1947 | 551,172.26 | 1953 | (152,108.95) |
| 1948 | 513,840.86 | 1954 | (42,788.32) |
| 1949 | 280,096.91 | Jan. 1–Apr. 30, 1955 | (30,911.27) |
| 1950 | 1,014,748.64 | | |

In 1947 the Capitol Fuel Company became the sales agent for all the coal produced by Muskingum at Misco No. 1. The sales agency agreement was renewed periodically and the last renewal was executed on December 8, 1955, extending the agreement to March 31, 1961.

The facilities at Misco No. 1 included a preparation plant with

tracks to provide simultaneous loading of four railroad cars. In May 1953 Muskingum commenced work on a new mine opening into the same coal seam worked by Misco No. 1. The new opening, about 2 miles from the first opening, is hereinafter called Misco No. 2. Coal production was begun at Misco No. 2 on October 29, 1954. Misco No. 2 was connected to the preparation plant at Misco No. 1 by an overland belt conveyor.

Misco No. 1 had been mined by the following conventional method: The seam was either undercut or overcut some 5 or 6 feet by a cutting machine, holes were bored in the coal face, dynamite was inserted in the holes, and the coal was blasted free. A loading machine then loaded the coal into shuttle cars, mine cars, or underground belt conveyor, and the coal was then transported to a main-line conveyor which brought it to the surface.

In 1950 a leading manufacturer of coal-mining machinery introduced the Colmol, a type of boring machine that completely removed the coal from the coal face without undercutting or blasting. In 1951 or 1952 the same manufacturer introduced the Molveyor which was designed as a supporting unit to the Colmol. The Molveyor consisted of a flexible train of wheel-mounted belt conveyors of 15-foot lengths, and when the Molveyor was attached to the Colmol it formed a system of continuous mining. After the coal was removed from the coal face by the Colmol, it passed under the machine to the Molveyor which carried the coal through the mine to the main conveyor system.

In September 1954 Jones contacted the manufacturer about purchasing equipment for Misco No. 2, and after an inspection of the mine in November 1954 by engineers from the manufacturer, Muskingum ordered two Colmol units and two Molveyor units in December 1954. Subsequently, in 1955, Muskingum canceled the orders for one Colmol and one Molveyor. The remaining Colmol unit was delivered in January 1955 and the Molveyor was delivered in sections at various times between January and June 1955. A second Colmol unit and a second Molveyor unit were ordered in June 1955 and were delivered to Muskingum in July 1955. A third Colmol unit was ordered by Muskingum on June 28, 1955, and was delivered on October 10, 1955. A third Molveyor was ordered on August 11, 1955, and delivered on October 21, 1955. The total price of the three Colmol-Molveyor units was about $464,000.

For several months after delivery of the first units of the new mining equipment to petitioner in January 1955, the manufacturer sent members of its staff to train petitioner's crews in the use and maintenance of the equipment. Petitioner had difficulties with the new equipment from the beginning, and during the period from January to June 1955 the manufacturer found it was necessary to make

several changes in the parts of the Colmol. Also, the Molveyor began to develop belt trouble due, in part, to incorrect design and in part to the material used to manufacture the belt. Changes were made in the design and various materials used in the belt itself, but by July 1956 the manufacturer discontinued the manufacture of Molveyors of that particular design.

By November 1955 some shifts in Misco No. 2 were reaching a production of 300 tons per crew per shift, although 250 tons was a more common average. The conventional mining system as operated in Misco No. 1 and Misco No. 2 had been 125 to 150 tons per crew per shift, with 9 or 10 men in a crew. It had been estimated by the manufacturer that Colmol, with about one-half that number in a crew, could reach a production of 300 tons per shift.

In November 1955 Jones employed a mining engineer as assistant general manager of Muskingum.

In 1953 the number of men employed by the Muskingum in the Misco Mine ranged from 247 (December) to 495 (March and April); in 1954, from 186 (October) to 295 (December); in 1955, from 222 (March) to 402 (November); and in the first 6 months of 1956, from 237 (May) to 400 (January).

Muskingum's net income (or loss) from Misco No. 2 from October 29, 1954, to July 10, 1956, was as follows:

| Year | Net income (or loss) |
|------|---------------------|
| Oct. 29–Dec. 31, 1954 | ($13,272.46) |
| Jan. 1–Aug. 31, 1955 | (206,315.85) |
| Sept. 1–Dec. 31, 1955 | (283,435.63) |
| Jan. 1–July 10, 1956 | (381,308.28) |

In 1954 Enterprises received $70,000 from the sale of goodwill of its Zanesville newspaper, and petitioner received $111,926.50 from the sale of machinery and equipment used in operation of this newspaper. Out of these proceeds petitioner and Enterprises advanced $169,280.05 to Muskingum during 1954 to develop Misco No. 2. In 1956 petitioner mortgaged for $30,000 the then-empty building which had been used to publish the Zanesville newspaper and advanced $29,000 to Muskingum for development purposes.

Muskingum, over the period May 1953 to July 10, 1956, received total net advances from petitioner and Enterprises in the amount of $393,730.58. The advances and repayments were as follows:

| Period | Advances | Repayments |
|--------|----------|-----------|
| Sept. 30, 1953 (date of first advance in 1953), to August 1955 | $320,268.68 | $42,930.79 |
| September 1955–July 10, 1956 | 161,359.28 | 44,966.59 |

Over the period May 1953 to July 10, 1956, Muskingum invested a total of $1,026,610.30 in capital assets at Misco No. 2. This investment was made as follows:

| Period | Investment |
|---|---|
| May 1953–Dec. 1953 | $165, 669. 00 |
| 1954 | 105, 223. 72 |
| Jan. 1955–Aug. 1955 | 508, 408. 57 |
| Sept. 1955–July 10, 1956 | 247, 309. 01 |
| Total | 1, 026, 610. 30 |

In August 1955 Jones discussed the progress at Misco No. 2 with his attorney. The attorney pointed out that petitioner and Enterprises were financing Misco No. 2 and that they would have to continue to advance funds to Muskingum for development purposes. The attorney then advised Jones to transfer his stock in Muskingum to the petitioner. On September 1, 1955, Jones transferred his 1,197 shares (out of an outstanding 1,199 shares of common stock) of Muskingum common stock to the petitioner.

In 1949 Jones had become ill with myeloma and he continued to suffer from this disease until his death in December 1957.

The consolidated income (or loss) of Muskingum and its subsidiary for the period from August 31, 1955, to July 10, 1956, was as follows:

| Period | Net income (or loss) |
|---|---|
| Aug. 31–Dec. 31, 1955 | ($176, 806. 77) |
| Jan. 1–July 10, 1956 | (369, 950. 60) |

The consolidated income of petitioner and Enterprises for the years 1954, 1955, and 1956 (through July 30) was as follows:

| 1954 | Amount |
|---|---|
| Petitioner | ($11, 273. 31) |
| Enterprises | 166, 730. 82 |
| Consolidated net income | $155, 457. 51 |

| 1955 | |
|---|---|
| Petitioner | (19, 889. 45) |
| Enterprises | 175, 283. 61 |
| Consolidated net income | 155, 394. 16 |

| 1956 (through July 30) | |
|---|---|
| Petitioner | (4, 523. 06) |
| Enterprises | 102, 496. 46 |
| Consolidated net income | 97, 973. 40 |

At intervals from October 1955 through June 1956, Jones and his attorney discussed the possible sale of the Muskingum mining properties with two prospective buyers. Initially, Jones placed the selling price at about $2,500,000. On July 9, 1956, Muskingum executed

an agreement to sell to Simpson Coal & Chemical Corporation all of Muskingum's mining properties for $884,000. Muskingum incurred a net loss of about $480,000 on the sale of its mining properties.

On July 30, 1956, Muskingum filed a petition in bankruptcy in the United States District Court, Southern District of Ohio, Eastern Division.

Muskingum reported losses from operations on its returns for the years 1951 through August 31, 1955, as follows:

| Year | Amount |
|---|---|
| 1951 | ($199, 726. 92) |
| 1952 | (197, 575. 28) |
| 1953 | (117, 241. 81) |
| 1954 | ( 65, 701. 94) |
| 1955 (to August 31) | (153, 352. 59) |

On the consolidated returns filed by petitioner for the years 1951 through 1953 it reported the following gain (or losses) from the two newspapers published by Enterprises:

| Year | Petitioner | Zanesville News | Massillon Independent |
|---|---|---|---|
| 1951 | ($4, 330. 49) | ($137, 506. 48) | $173, 279. 77 |
| 1952 | 1, 239. 26 | (170, 882. 19) | 163, 512. 58 |
| 1953 | 5, 120. 53 | (162, 846. 78) | 180, 170. 97 |

The consolidated income tax return filed by petitioner and its affiliates for 1955 included the operating losses of Muskingum for the period from September 1, 1955 (the date when Jones transferred his Muskingum common stock to petitioner), to December 31, 1955, in the amount of $176,806.77. The consolidated income tax return filed by petitioner and its affiliates for 1956 showed a loss incurred by Muskingum for the period from January 1, 1956, to July 31, 1956, in the amount of $852,204.15, with $475,664.40 of this amount attributable to the loss incurred by Muskingum in the sale of its mining properties at the end of July 1956.

Respondent disallowed the deduction for the loss incurred by Muskingum in 1955 in the amount of $176,806.77, and he also disallowed the deductions for losses in 1956 by Muskingum and Jones Motor Sales, Inc., in the respective amounts of $852,204.15 and $868.15. Respondent's explanation for the disallowance in both years was that the principal purpose of acquisition of these companies was to avoid Federal income tax and that the losses were disallowed under section 269.

OPINION.

Section 269 provides that if "any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of

a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed." Respondent's determination that the principal purpose for the petitioner's acquisition of the Muskingum stock on September 1, 1955, was to obtain a tax benefit is presumptively correct, with the burden on the petitioner to show that such determination was erroneous. *American Pipe & Steel Corporation*, 25 T.C. 351, affd. 243 F. 2d 125.

When petitioner acquired controlling stock in Muskingum on September 1, 1955, petitioner owned 501 out of 505 shares outstanding stock in Enterprises. Up to 1954 Enterprises published the Zanesville News and the Massillon Evening Independent. The Zanesville News was unprofitable and it was discontinued in 1954, and Enterprises continued thereafter to publish only the Massillon Evening Independent which for years had shown substantial annual profits.

From 1951 through August 31, 1955, Muskingum reported operating losses of $199,726.92, $197,575.28, $117,241.81, $65,701.94, and $153,352.59, respectively. By August 31, 1955, Muskingum had ceased mining operations in Misco No. 1 and was operating its new mine, Misco No. 2, and was in the midst of an expensive changeover to a new type of highly mechanized mining method. It fairly appears that it was contemplated Muskingum would suffer further operating losses for a period of time. Muskingum was encountering numerous difficulties with the new equipment and it was discovered that some of these difficulties were due to faulty design. Some of the difficulties were never finally rectified. From May 1953 to August 31, 1955, Muskingum invested a total of $779,301.29 in capital assets at the new mine, and during this same period Muskingum had received advances from petitioner and Enterprises in the total amount of $320,268.68 (with repayments by Muskingum in the amount of $42,930.79).[2] At this juncture, on September 1, 1955, petitioner acquired control of Muskingum from Jones and petitioner was then able to offset the earnings of Enterprises in 1955, $175,283.61, and 1956, $102,496.46, with the operating losses of Muskingum from September 1, 1955, to December 31, 1955 ($176,806.77), and from January 1, 1956, to July 10, 1956 ($369,950.60).

Petitioner argues on brief that its acquisition of Muskingum "was a *bona fide* business move, placing ownership where it belonged, with the true investor"; that "the principal purpose was simply to realign

---

[2] From May 1953 to July 10, 1956, Muskingum invested a total of $1,026,610.30 in capital assets at Misco No. 2. Of this total $393,730.58 was advanced by petitioner and Enterprises, $608,879.72 represents obligations under conditional sales contracts, and $24,000 represents an obligation under a chattel mortgage.

the structure of the Jones corporations to properly reflect their changed relationship and to more effectively utilize the strength of the two corporations in an effort to bring Muskingum into prosperity and a profitable investment."

We believe, however, that the principal purpose for the acquisition was to obtain tax benefits not otherwise available to petitioner. Jones' attorney, who advised Jones to transfer his Muskingum stock to petitioner, frankly stated:

> I further pointed out to Mr. Jones that if the Newspaper Company [Enterprises] was going to continue for some time to come, to advance all of its earnings to Muskingum to carry on with Misco No. 2, that with a consolidation until Misco 2 got into a profit condition, the Newspaper Company [Enterprises] would have more profits to advance to Muskingum for the development of Misco No. 2.

In other words, the petitioner would be able, on the consolidated return, to offset the earnings of Enterprises with the Muskingum operating losses, and by thus reducing the tax burden on the Enterprises' profits, it (Enterprises) would have "more profits" to advance to Muskingum.

We feel this was the principal purpose of the acquisition. It was to utilize Muskingum's anticipated losses on a consolidated return and thereby secure the benefit of a deduction that petitioner "would not otherwise enjoy." Petitioner's acquisition of Muskingum served no business purpose as distinguished from a tax-reducing purpose. We hold the principal purpose for petitioner's acquisition of Muskingum was the avoidance of income tax that is proscribed by section 269.

There is nothing in the statute or in the relevant legislative history to support petitioner's contention that section 269 was not intended to apply to the "consolidation" of two commonly controlled corporations. On the contrary, the unambiguous language of section 269 explicitly covers such a situation in that it applies in all instances where "any person or persons acquire, * * * control of a corporation" for the principal purpose of obtaining a tax benefit, which is what took place here. Nor has petitioner cited any case that supports its argument. In fact, the case authority clearly indicates that where a so-called "loss" corporation is acquired by an affiliated group of corporations under common ownership so that its postaffiliation losses can be used on the consolidated income tax return to offset the earnings of the profitable corporations of that affiliated group, the use of such losses may be disallowed either under section 269 or under sections 1501–1505 (the consolidated returns provisions). *R. P. Collins & Co.* v. *United States*, 303 F. 2d 142; *Elko Realty Co.* v. *Commissioner*, 260 F. 2d 949, affirming 29 T.C. 1012; see also *J. D. & A. B. Spreckels Co.*, 41 B.T.A. 370.

Petitioner also argues that the loss incurred by Muskingum in July 1956 on the sale of its assets, as distinguished from Muskingum's operating losses from January 1, 1956, through July 1956, does not fall within the interdicted purpose of section 269. We disagree. In *Temple Square Mfg. Co.*, 36 T.C. 88, 95, this Court said that "Once the principal purpose of the acquisition is found, namely, to evade or avoid tax, any deduction which would not otherwise be available, is rendered unallowable." A similar approach was adopted by the Court in the *R. P. Collins* case. In that case the taxpayer filed a consolidated income tax return in which it utilized the postaffiliation losses of a recently acquired corporation. These losses consisted of (1) operating losses and (2) capital losses stemming chiefly from the loss on the sale of the acquired corporation's plant and equipment. There was evidence that prior to the acquisition of the "loss" corporation the taxpayer had been apprised of the substantial tax loss which could result from a quick sale of the corporation's assets. Taxpayer therefore agreed that whatever might have been its overall purpose in acquiring the corporation (i.e., to take advantage of the expected losses from a sale of its plant and equipment) it assuredly was not a principal purpose to acquire operating losses during the postaffiliation period. The Court of Appeals rejected this attempt to fragmentize the losses:

We find this argument unpersuasive because, on the facts of this case, it unrealistically attempts to segregate into isolated segments a course of conduct which is essentially unitary both in conception and in impact. Assuming, as taxpayer would have us do, that the court could conclude that the "overall" purpose of the acquisition was to avoid taxes, viz., to obtain the capital losses resulting from the sale of the plant and equipment, then we believe that it must have been within the fair contemplation of the taxpayer that certain operating losses would necessarily be incurred before this ultimate purpose could be effectuated and, to that extent, the operating losses would be included as a necessary incident of the "overall purpose." In effect, once it is conceded that Priscilla was acquired with a view towards obtaining the tax advantages stemming from a corporate dismemberment, then we believe that all the losses which immediately precede this ultimate act are constituent elements of a course of conduct proscribed by Section 129. They are tarred by the same brush.

The argument here is a little different than the above case for here the principal purpose was to secure the contemplated post acquisition operating losses. But the principle is the same. We do not believe that the statute requires at the time of acquisition a precise awareness of every deduction, credit, or other allowance that such acquisition will bring to the taxpayer. It is enough if at the time of acquisition the principal purpose was to obtain a tax benefit.

Petitioner makes an alternative argument that the net advances by petitioner and Enterprises to Muskingum as of July 30, 1956, in the amount of $257,857.31 became worthless in 1956 and should be allowed as a business bad debt deduction by petitioner under section 166. This

issue does not appear in the pleadings and is raised for the first time on brief. We have held that such an issue will not be considered by the Court. *Merle P. Brooks,* 36 T.C. 1128; *Warner G. Baird,* 42 B.T.A. 970. Moreover, petitioner made no effort either at the trial or on brief to establish that a true debtor-creditor relationship existed between petitioner and Enterprises on the one hand and Muskingum on the other. See *O. H. Kruse Grain & Milling* v. *Commissioner,* 279 F. 2d 123, where the court lists 11 separate determining factors generally used by the courts to decide whether amounts advanced to a corporation constitute indebtedness or equity capital. What evidence there is rather indicates that the advances to Muskingum, which were largely used by Muskingum to purchase capital assets for its mining operations, were not intended as debts.

We hold that petitioner has not established that the principal purpose for its acquisition of Muskingum in September 1955 was other than to obtain the benefit of its deductions, credits, or other allowances.

*Decision will be entered under Rule 50.*