*Decision will be entered under Rule 50.*

FAWN FASHIONS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 438–62.   Filed November 15, 1963.

*S. Jarvin Levison* and *Jack H. Zinkow*, for the petitioner.
*Winfield A. Gartner*, for the respondent.

**210**

OPINION

Section 269 provides that if "any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed." Section 269(c)[2] provides that where the corporation described in section 269(a) is acquired for a purchase price which is "substantially disproportionate" to the total of the adjusted basis of the property of the corporation and the tax benefits acquired, then such fact "shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax."

L & B paid $500 for petitioner about June 1957 and acquired net operating loss carryovers in the total amount of $193,535.11. Petitioner's assets at the time of acquisition were minimal. It is obvious that the consideration paid was "substantially disproportionate" to the tax benefits acquired and to petitioner's property, and petitioner acknowledges this on brief.

To meet its burden of showing that the acquisition did not have the avoidance of tax as its principal purpose, petitioner contends that L & B was concerned about the Fawn name which L & B was using on its products (children's wear) and that its dominant purpose in acquiring petitioner was to protect the use of that name.

It seems strange that L & B manufactured and sold its products under the Fawn name for about a year before it felt enough concern

---

[2] This section is applicable only with respect to acquisitions after March 1, 1954.

for the name to do something about it. Petitioner, a sales corporation, had managed to accumulate net operating losses of about $188,000 in the first year and a half of its existence (June 1954 through the fiscal year ending January 31, 1956) and by the end of 1955 the corporation practically ceased operations. The value of the Fawn name under these circumstances is, at best, conjectural.

As for the purported reasons that prompted L & B to protect the Fawn name by acquiring petitioner in the middle of 1957, there are some broad, and wholly uncorroborated, generalities as to the possible machinations of a certain Dunton Whitehead, who had been a moving force in petitioner's incorporation in June 1954. Much of the testimony regarding this man is extremely vague. Briefly stated, the testimony is to the effect that Whitehead (for some unexplained reason) was unhappy about the sale of the machinery and equipment of Dunton, Inc. (the contract manufacturer of the children's wear sold by the petitioner corporation in 1954 and 1955), to L & B in April 1956, and L & B feared that Whitehead, who was a "rather unpredictable" individual, "could very well step in at a later date and manufacture an identical product, and possibly put us out of business." If L & B was so concerned, it would have been a logical and prudent move to acquire the Fawn name from petitioner in April 1956,[3] when L & B began its manufacturing and selling operations. But L & B's attorney who was involved both in the purchase of the machinery from Dunton, Inc., in 1956 and the acquisition of petitioner by L & B in 1957, made no move to acquire the Fawn name at that time and, in fact, he testified that "There was no discussion about acquiring the name Fawn." We find the evidence on this whole matter of Dunton Whitehead singularly unpersuasive.

It also appears that neither petitioner, up to the time it went into receivership in 1956, nor L & B all during the period it manufactured and sold the Fawn products in 1956–57 ever made an application to register the Fawn name and emblem as a trademark in the U.S. Patent Office. L & B's attorney testified that he learned from trademark counsel in Washington that "there were several different types of concerns that had registered the name Fawn, and that there was one that had registered the name Fawn with a mark which was similar to the deer." So, continued the attorney, "we have never pressed it because we felt if we filed an application for a trademark, then the other people would become aware of it; and this might stir up something that we don't really want now." But the significant fact in all this is that the inquiries were made, according to the attorney, *after* L & B had acquired the petitioner. We find it highly

---

[3] Petitioner had been placed in receivership in March 1956, and there is nothing to suggest that the name Fawn was not available to interested buyers.

implausible that such pertinent inquiries as to the validity and worth of the Fawn name as a trademark would be made *after* the acquisition of petitioner, rather than *before*, if the dominant purpose for the acquisition of petitioner was, in fact, to obtain the name.

No convincing reason appears in the record as to why L & B did not simply buy the name Fawn from the receiver instead of going through the tortuous procedure of buying the franchise of the product corporation under a unique provision of Georgia law (which both parties indicate has not been interpreted by the State courts), then change the name of the shell corporation to K & S Corp., then put K & S Corp. through bankruptcy proceedings in the Federal District Court, then obtain the discharge in bankruptcy some 7 months after L & B acquired the corporation, then transfer L & B's sales activities to the corporation, and then change the name of the corporation from K & S Corp. back to Fawn Fashions, Inc. The attorney for L & B admitted at the trial that the name Fawn "probably could have" been purchased from the receiver, and he further admitted he made no attempt to purchase the name.

It is contended that when L & B acquired petitioner in the middle of 1957 no one knew the exact nature of the losses incurred during the year and a half of petitioner's operations as a sales corporation, and that no one on L & B's behalf had ever seen petitioner's books or tax returns prior to the acquisition. From this premise, it is argued that no one knew of the tax benefits to be derived and that, consequently, the proscribed purpose for the acquisition did not exist. We are satisfied, however, that all of the interested parties knew, prior to the acquisition, that petitioner was in financial distress and had incurred sufficient losses to place it in receivership. Michalove (L & B stockholder) testified that he was aware of substantial claims in the receivership proceedings. He also testified that he thought petitioner had some losses but he "had no way to judge the extent of their losses." Bock (L & B stockholder) testified that he "naturally" knew of petitioner's troubles. When L & B commenced operations in April 1956 it took over the premises formerly used by Dunton, Inc., and petitioner, which were in the same building. L & B even filled orders which had been obtained by petitioner's representatives in the field. We cannot believe that Bock and Michalove were ignorant of petitioner's financial plight before the acquisition. L & B's attorney, who was directly involved in the acquisition of petitioner, was aware of the large number of creditors' claims in the receivership and he "just assumed that there was a loss."

It is immaterial for purposes of section 269 that the parties were unaware of the precise amount of the losses. In *Zanesville Investment Co.*, 38 T.C. 406, on appeal (C.A. 6), this Court said: "We do

not believe that the statute requires at the time of acquisition a precise awareness of every deduction, credit, or other allowance that such acquisition will bring to the taxpayer. It is enough if at the time of acquisition the principal purpose was to obtain a tax benefit." See also *R. P. Collins & Co.* v. *United States,* 303 F. 2d 142. It is enough, we think, that the parties involved here had knowledge of significant losses which could be turned to their tax benefit. by acquiring petitioner. Petitioner's attorney was certainly not unacquainted with tax matters.[4]

In *Army Times Sales Co.,* 35 T.C. 688, this Court said: "The judicial ascertainment of someone's subjective interest or purpose motivating actions on his part is frequently difficult. One method by which such ascertainment may be made is to consider what the immediate, proximate, and reasonably to be anticipated consequences of such actions are and to reason that the person who takes such actions intends to accomplish their consequences." Here, L & B's operations were beginning to prove profitable, after an initial year of slight losses. L & B transferred its sales operations to petitioner on December 31, 1957, the same day petitioner was discharged in bankruptcy. Petitioner showed net profits (before deduction of net operating loss carryovers) in the fiscal years ending January 31, 1959, 1960, and 1961, of $68,215.98, $40,013.51, and $128,637.98. As a result of the acquisition, petitioner was able to utilize net operating losses in excess of $190,000.

We find, and so hold, on the basis of the considerations discussed above and on the entire record, that the petitioner has not established that the principal purpose for its acquisition was other than to obtain the benefit of its net operating losses.

Respondent presents a second argument, which we consider sound, in support of his determination. Section 382 disqualifies a net operating loss where three conditions are met: (1) An increase of at least 50-percentage points in the stock ownership of a corporation by a prescribed number of persons within a taxable year beginning after June 22, 1954; (2) the increase in ownership is attributable to purchases of the stock; and (3) the corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the stock. It is agreed that the first two conditions are met here. Respondent, relying on his regulations under section 382, contends that the third condition is also met. Section 1.382(a)-1(h)(6), Income Tax Regs., provides that a "corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the owner-

---

[4] The attorney was formerly with the Regional Counsel's Office of the Internal Revenue Service in New York City for about 4½ years until December 1955.

ship of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership." Petitioner argues that the regulation is arbitrary and inconsistent with the intent of the statute and therefore invalid.

Respondent's regulation clearly covers the situation here. Petitioner's sales activities ceased about the end of 1955 and the corporation remained inactive for about 2 years, until L & B revived it early in 1958. It was a shell corporation when L & B acquired it in the middle of 1957, about a year and a half after it ceased operations. Legislative history supports the correctness of respondent's regulation. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 285.

Respondent also determined that petitioner is liable for addition to tax under section 6651(a) for the taxable year ended January 31, 1958, for failure to file a timely return. It is stipulated that the return was due April 15, 1958, but was not filed until March 16, 1959. Petitioner makes no argument on brief to show that such failure was due to reasonable cause. We sustain respondent on this issue.

*Decision will be entered for the respondent.*