Herculite Protective Fabrics Corp. v. Commissioner.
Herculite Protective Fabrics Corp. v. Commissioner
Docket No. 3587-64.
United States Tax Court
T.C. Memo 1966-277; 1966 Tax Ct. Memo LEXIS 8; 25 T.C.M. (CCH) 1436; T.C.M. (RIA) 66277; December 28, 1966
Norman E. Schlesinger and Gerald P. Seid, 11 Commerce St., Newark, N.J., for the petitioner. Donald H. Cuozzo, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency in petitioner's income tax for 1961 in the amount *9 of $51,143.64. The only issue is whether petitioner's deduction in 1961 for net operating losses incurred in prior years should be disallowed because of the provisions of section 269 of the 1954 I.R.C.[1] or because of the special limitations on net operating loss carryovers in section 382. Findings of Fact Some of the facts were stipulated and they are so found. Herculite Protective Fabrics Corp., hereinafter called the petitioner, was incorporated under the laws of the State of New York on December 19, 1946, and its principal place of business is in Newark, New Jersey. Petitioner filed its return, based on an accrual method of accounting, for the year 1961 with the district director of internal revenue at Newark, New Jersey. At the time of its incorporation in 1946, the petitioner was known as Ernest Chandler, Inc. and until May 1960 had its plant and facilities at 10 Bleecker Street, New York, New York. Petitioner was organized in 1946 to continue a business operated as a proprietorship for many years by one Ernest Chandler, who was well known as an authority in the *10 industry dealing with canvas protective coverings. Prior to his death in 1956, Ernest Chandler was president of the petitioner, and, after his death, his widow, Elizabeth Chandler, served as president of the petitioner. Elizabeth was the sole stockholder of the petitioner from its incorporation in 1946 until May 11, 1960, and she also owned the property at 10 Bleecker Street, New York, New York. After her husband's death, Elizabeth and her son, Fred Chandler, continued to operate petitioner's business. Prior to May 11, 1960, petitioner was in the business of manufacturing canvas protective coverings, generally using a cotton duck canvas which is purchased from outside sources. On occasion, a plastic coated cotton fabric was used by petitioner to make the finished product for customers on test orders. Petitioner performed the function of cutting, sewing and otherwise shaping the canvas into the finished product which, for the most part, was made in accordance with the specifications required by the customer. Petitioner (prior to May 11, 1960) specialized in supplying various canvas products to utilities. At the end of 1955, petitioner had a deficit of $31,734.60, which reflected *11 a net operating loss for 1955 in the amount of $10,444.52, and petitioner continued to incur net operating losses in each of the years 1956 through 1959 in the respective amounts of $56,452.36, $5,267.10, $8,796.12 and $6,196.92, or a total of $76,712.50. Petitioner's income tax return for 1956 showed gross sales of $243,430.78, which amount included bulk or inventory sales of $153,165.76. Petitioner's income tax returns for 1957 through 1959 showed net sales in the respective amounts of $64,181.49, $66,201.99 and $42,989.97. As of May 11, 1960, the petitioner owed $88,780.86 in notes payable to Elizabeth Chandler and to certain corporations controlled by her. These notes were executed to cover obligations which had been represented as "Other liabilities" on petitioner's balance sheets for the periods ending December 31, 1955 through 1959. Petitioner's balance sheets as of December 31, 1958 and 1959 show the following: ASSETS
12/31/58
12/31/59
Cash
$ 200.00
$ (2,052.73)
Notes and Accounts receivable
19,703.26
9,712.04
Inventories
6,000.00
5,000.00
Fixed depreciable assets
$15,464.12
$15,464.12
Less: Accumulated dep.
8,071.84
7,392.28
8,071.84
7,392.28
Prepaid expenses
1,000.00
500.00
TOTAL ASSETS
$ 34,325.54 *
$ 20,551.59
LIABILITIES AND CAPITAL
Accounts payable
$ 11,001.84
$ 4,001.84
Bonds, notes & mortgages payable (maturity in
less than 1 year)
6,100.00
6,100.00
Other liabilities
83,370.00
82,792.97
Common stock
37,426.93
37,426.93
Earned Surplus (deficit)
(103,573.23)
(109,770.15)
TOTAL LIABILITIES AND CAPITAL
$ 34,325.54
$ 20,551.59
*12 Fellowcraft Engineering, Inc. (hereinafter called Fellowcraft), was incorporated in February 1955 under the laws of New Jersey. Seymour Hyman, who had a Master's Degree in industrial engineering and also did further graduate work in engineering, was the sole stockholder of the corporation during the period here relevant. Fellowcraft began business operations in a small plant in Newark, New Jersey, moved to Belleville, New Jersey, in 1956, moved to a larger location (5,000 sq. ft.) in Newark in 1957, and moved again in 1959 to a 15,000 sq. ft. building in Newark where it thereafter continued to do business. Fellowcraft filed its Federal income tax return for its fiscal year ended January 31, 1961, with the district director of internal revenue at Newark, New Jersey. Fellowcraft described its business operations on its tax returns for the fiscal years ended January 31, 1959 and 1960 as a manufacturer of coated fabrics. Fellowcraft has always dealt exclusively with synthetic fabrics. Early in its corporate existence, the petitioner purchased the synthetic fabrics from outside *13 sources and made protective coverings of varying kinds by the process of electronic welding or fusing. In 1959, Fellowcraft started to install machinery to manufacture its own synthetic fabric and subsequently began to manufacture its own synthetic fabric which it sold under the trade name Herculite. This new synthetic product was manufactured by laminating thin plastic film to a woven nylon fiber by the application of heat and pressure, giving it properties of improved tear resistance and fire resistance. It was manufactured in various colors and weights. Fellowcraft sold the synthetic fabric in rolled form to other fabricators, and it also made the synthetic fabric into protective covers of various kinds which were sold to the ultimate consumer. Fellowcraft also sold the synthetic fabric in roll form to customers who were able to use it as protective covering without any further fabrication. Fellowcraft did not have sewing equipment, and, consequently, when its customers required fabrication of the synthetic fabric beyond seam welding, Fellowcraft would subcontract the work to sewing shops that specialized in canvas products. Fellowcraft reported net sales in its Federal income *14 tax returns for the taxable years ended January 31, 1958 through 1961 in the respective amounts of $248,862.83, $419,002.16, $586,736.23 and $864,922.25, and also reported net income for these years in the respective amounts of $9,416.07, $23,992.24, $30,738.08 and $25,189.38. Since the year 1955, there has occurred a significant increase in the use of coated synthetic fabrics in making protective coverings in place of canvas products made from cotton duck. Late in 1959, Hyman learned that the business conducted by petitioner was for sale and, early in 1960, negotiations were begun for the acquisition of petitioner's stock from Elizabeth Chandler. In March 1960, Hyman examined petitioner's plant and interviewed petitioner's employees. Hyman was aware of petitioner's net operating losses, and these losses were discussed at the conferences between the parties. On May 11, 1960, Hyman purchased from Elizabeth Chandler for a total price of $8,000, pursuant to an agreement dated April 4, 1960, all of the stock of petitioner (200 shares of common stock), together with certain notes payable by petitioner to Elizabeth Chandler and to certain corporations controlled by her in the total amount *15 of $88,780.86. The purchase price of $8,000 was allocated as follows: $1,000 to the stock and $7,000 to the notes. Subsequent to the sale of the stock, Elizabeth Chandler and her son, Fred, ceased to be employed by or have any further interest in petitioner. At the time of the stock purchase on May 11, 1960, petitioner's assets consisted of inventory, office equipment and supplies, and equipment used in the manufacture of canvas finished products. The manufacturing equipment included 21 sewing machines and other assorted types of machines and equipment, such as cutting machines and grommeting machines. Immediately prior to the purchase by Hyman of petitioner's stock, petitioner had 5 employees (in addition to Elizabeth Chandler and her son Fred), including 3 sewing machine operators, salesman, and an elevator operator. The April 4, 1960 agreement between Elizabeth Chandler and Hyman provided for a penalty payment $20of per day to Elizabeth if the petitioner's property was not removed from the premises at 10 Bleecker Street in New York City within 10 days of the closing date. Late in May 1960, Hyman moved petitioner's assets, plant and facilities to leased premises in Newark, New *16 Jersey, where petitioner continued its business operations. Petitioner's 3 sewing machine operators and the salesman continued in petitioner's employ after the move to Newark, although within about 1 month the salesman and one of the sewing machine operators left. Thereafter, there was a large turnover of newly employed personnel in petitioner's employment. In late May or early June 1960, Hyman hired one William Wells to act as general manager for petitioner. In November 1960, Wells was discharged and he was replaced by one Jay Connolly. Petitioner reported net sales of $37,510.79 and a net operating loss of $19,431.29 in its Federal income tax return for 1960. Petitioner's net operating losses for the years 1956 through 1960 totaled $96,143.79. The bulk of petitioner's sales in 1960 consisted of finished products made from cotton duck canvas ($20,159.51) and the synthetic fabric called Herculite ($6,752.96). The Herculite was purchased by petitioner from Fellowcraft. As of January 31, 1961, Fellowcraft transferred all of its assets and liabilities to petitioner (then still known as Ernest Chandler, Inc.) in exchange for 4,300 shares of petitioner's common stock. Petitioner's name *17 was thereupon changed to Herculite Protective Fabrics Corp., and all business activities of Fellowcraft were terminated. No steps were taken with respect to the dissolution of Fellowcraft. Petitioner's balance sheet as of December 31, 1960, showed total assets of $13,334.46 and a deficit of $129,206.44. Fellowcraft's balance sheet as of January 31, 1961, showed total assets of $171,093.13 and an earned surplus of $42,211.83. After the acquisition of Fellowcraft's assets and liabilities, the petitioner conducted its business in two separate divisions called (1) the Fellowcraft Division and (2) the Ernest Chandler Division. The Fellowcraft Division continued its operations and business previously conducted by Fellowcraft and continued to maintain its plant and facilities at 661 Fourth Street, Newark, New Jersey. The Ernest Chandler Division continued the business and operations previously conducted by petitioner and continued to maintain its plant and facilities at 11 East Runyon Street in Newark. During 1961, while the two divisions were being operated at separate plants, separate books of account were maintained by petitioner for each division. On September 1, 1961, petitioner *18 sold the physical assets, goodwill and inventory of its Ernest Chandler Division to a New Jersey limited partnership association (known as Ernest Chandler Co., Limited) organized by one Lester Stern. The sales agreement stated a total consideration of $10,000 for the sale, with $7,000 of the total represented by a series of promissory notes bearing 5 percent interest. The physical assets sold by petitioner included machinery and equipment which were owned by petitioner on May 11, 1960, when Hyman acquired all of petitioner's stock from Elizabeth Chandler. Petitioner kept only 2 of the sewing machines and one grommeting unit. Thereafter, the Ernest Chandler Division of the petitioner ceased to operate. Ernest Chandler Co., Limited, defaulted on the terms of the September 1, 1961 agreement by failing to meet payments on its promissory notes payable to petitioner. As a result of such default, petitioner reacquired the physical assets which were sold, and, on January 16, 1962, sold them to a corporation called Astro Canvas and Rope Co., Inc., which corporation also defaulted on the terms of its contract by failing to meet the payments on its promissory notes payable to petitioner. Thereafter, *19 petitioner again re-acquired the assets sold to Astro Canvas and Rope Co., Inc. on January 16, 1962, and sold them at auction. Petitioner, on its Federal income tax return for 1961, reported gross receipts of $836,955.02 which consisted of gross sales from petitioner's Fellowcraft Division for the period from February 1, 1961, through December 31, 1961, in the amount of $809,093.19, and gross sales from petitioner's Ernest Chandler Division for the period from January 1, 1961, through August 31, 1961, in the amount of $27,861.83. Petitioner also reported taxable income, before the net operating loss deduction, in the amount of $114,267.47. Petitioner claimed a net operating loss deduction in 1961 in the amount of $96,143.79, which resulted in net taxable income for 1961 in the amount of $18,123.68. The net operating loss deduction of $96,143.79 claimed by petitioner in 1961 was carried forward from the years 1956 through 1960 in the respective amounts of $56,452.36, $5,267.10, $8,796.12, $6,196.92 and $19,431.29. Respondent, in the statutory notice of deficiency, disallowed the net operating loss deduction of $96,143.79 claimed by petitioner for 1961, relying in part upon the *20 provisions of sections 269 and 382. Opinion Section 269 provides that if "any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed." Section 269(c) provides that where the corporation described in section 269(a) is acquired for a purchase which is "substantially disproportionate" to the total of the adjusted basis of the property of the corporation and the tax benefits acquired, then such fact "shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax." Petitioner has the burden of showing that the acquisition did not have the avoidance of tax as its principal purpose. When Hyman acquired petitioner's stock in May 1960 from Elizabeth Chandler, the corporation had sustained a net operating loss in each of the years 1955 through 1959. Its sales had substantially declined *21 since 1956. Petitioner had mostly been using a cotton duck canvas in making its protective coverings and it appears that, from at least 1955, coated synthetic fabrics were rapidly replacing canvas products made from cotton duck. Hyman, who organized Fellowcraft in 1955, was well aware of this trend in the industry and Fellowcraft had always used synthetic fabrics exclusively in making protective coverings. While petitioner's net sales remained static in 1957 through 1959 ($64,181.49, $66,201.99 and $42,989.97, respectively), Fellowcraft's net sales climbed steadily in its fiscal years ended January 31, 1958, 1959 and 1960 in the respective amounts of $248,862.83, $419,002.16 and $586,736.23. [2]
Against this factual background, we find unpersuasive petitioner's contention that its stock was acquired by Hyman in May 1960 because of its reputation in the protective covering business, because it had valuable customers, because its business was similar to Fellowcraft's, because it could be used as a vehicle to sell Herculite "seconds", and because Hyman was interested in the potential *22 for future growth represented by petitioner's equipment and personnel. There is no convincing evidence in the record to show that these were, in fact, the reasons for the acquisition. [3]
Instead, the tailored sequence of subsequent events requires other conclusions. Petitioner's net sales for 1960 declined to $37,510.79 and it incurred a net operating loss of $19,431.29 for that year, which increased the total net operating losses for the period 1956 through 1960 to $96,143.79. In January 1961, the profitable business operated by Fellowcraft was transferred to the petitioner corporation, which (under the new name of Herculite Protective Fabrics Corp.) then conducted its operations under two separate divisions: (1) the Fellowcraft Division and (2) the Ernest Chandler Division. In September 1961, petitioner sold the physical assets, goodwill and inventory of the Ernest *23 Chandler Division and henceforth its business operation was essentially the same as that previously conducted by Fellowcraft and (after January 31, 1961) by the Fellowcraft Division. Thus, the petitioner's machinery and equipment as of May 1960 (when Hyman acquired its stock) were now gone, its trained personnel (including 3 sewing machine operators and a salesman) were gone, and a net operating loss carryover of $96,143.79 remained, which petitioner claimed as a deduction in 1961. We do not believe that the period of about 9 months that elapsed between Hyman's acquisition of petitioner's stock on May 11, 1960 and the subsequent transfer of Fellowcraft (controlled by Hyman) to the petitioner corporation on January 31, 1961, stands in the way of the application of section 269. It is apparent from this record that the principal purpose for the acquisition of the petitioner was to obtain the benefit of its accumulated net operating losses, and we do not regard as too significant the particular sequence in which the various steps took place in order to achieve this purpose. See Luke v. Commissioner, 351 F. 2d 568 (C.A. 7, 1965), affirming a Memorandum Opinion of this Court. *24 Petitioner also makes much of the fact that prior to Hyman's acquisition of its stock in May 1960, he was unable to get financial statements showing petitioner's true condition. It is not clear what petitioner hopes to make of this argument. The record shows that, prior to the acquisition, Hyman knew of the petitioner's net operating losses and that the negotiating parties held innumerable conferences. Perhaps petitioner is suggesting that because he was unable to get information about the exact amount of tax benefit to be derived, the proscribed purpose for the acquisition did not exist. But, as we said in Fawn Fashions, Inc., 41 T.C. 205, "[it] is immaterial for purposes of section 269 that the parties were unaware of the precise amount of the losses" and "[it] is enough if at the time of acquisition the principal purpose was to obtain a tax benefit." It is also of some significance, we believe, in placing the acquisition of petitioner's stock in its true perspective, that out of the $8,000 Hyman agreed to pay for petitioner's stock and certain outstanding notes payable by petitioner, $7,000 was allocated to the notes and only $1,000 to the stock. This was done *25 even though, as petitioner seems to admit on brief, the notes by themselves were worthless. We find, and so hold, on the basis of the considerations discussed above and on the entire record, that the petitioner has not established that the principal purpose for its acquisition was other than to obtain the benefit of its net operating losses. In view of the conclusion reached, we do not believe it would be useful to consider the application of section 382 to the facts of this case. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the 1954 Internal Revenue Code↩, as amended.
*. The assets, as stipulated, actually total $34,295.54. The discrepancy is unexplained by the record.↩
2. In the fiscal year ending January 31, 1961, Fellowcraft's net sales climbed to $864,922.25.↩
3. Out of petitioner's approximately 60 customers in 1959, only a small fraction still remained in 1961. Moreover, the record reveals that the sales of sub-standard Herculite through the petitioner corporation in 1960 and later (after the merger) through the Ernest Chandler Division were not significant in amount.↩