**UNITED STATES of America,**
**Appellant,**

v.

**FENIX AND SCISSON, INC., a**
**corporation, Appellee.**

**No. 8135.**

United States Court of Appeals
Tenth Circuit.

May 12, 1966.

Rehearing Denied June 15, 1966.

Robert A. Bernstein, Atty., Dept. of Justice (C. Moxley Featherston, Acting Asst. Atty. Gen., Lee A. Jackson, Gilbert E. Andrews, Attys., Dept. of Justice, John M. Imel, Jr., U. S. Atty., and Sam E. Taylor, Asst. U. S. Atty., on the brief), for appellant.

J. Glenn Hahn, Kansas City, Mo., (Joseph A. Hoskins, Walter J. Kennedy and Hoskins, King, Springer & McGannon, Kansas City, Mo., on the brief), for appellee.

Before PICKETT, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

Taxpayer corporation instituted this suit in the court below seeking a refund of $40,618.90 of income taxes paid for the fiscal year ending October 31, 1958. From a jury verdict based upon interrogatories, the trial court granted judgment for the taxpayer. The government's motion for judgment notwithstanding the verdict and alternatively for a new trial was denied and this appeal was taken.

While the complaint sought to reinstate several deductions previously disallowed by the Commissioner, the only matter for review is whether taxpayer is entitled to deduct certain net operating loss carryovers incurred by its wholly owned subsidiary, Oronogo Mutual Mining Company (hereafter called Oronogo).

The taxpayer, Fenix and Scisson, Inc., is an Oklahoma corporation which during all the time in question engaged in heavy construction activity, particularly excavation of underground caverns for the storage of propane and butane gas. It has also conducted some mineral exploration. On October 14, 1955, it purchased all of Oronogo's stock and thereafter maintained it as a subsidiary until October 31, 1957, when Oronogo was liquidated in accordance with § 332 of the 1954 Internal Revenue Code, 26 U.S.C., and its assets merged into taxpayer. In its return for the fiscal year ending October 31, 1958, the taxpayer, relying on § 381(a) (1) and (c) (1),[1] deducted net operating loss carryovers incurred by Oronogo in 1953 ($28,222.80), 1954 ($10,441.72), and 1957 ($320.55).

The Commissioner disallowed taxpayer the losses first under § 269 claiming that the principal purpose for taxpayer's acquisition of Oronogo was the evasion of income tax by securing a deduction. The jury, however, found against the Commissioner on this point and no appeal is taken from that determination. The Commissioner's other basis for disallowing the loss carryovers was under § 382(a).[2] The theory being that Oronogo's net operating losses did not survive its stock acquisition by tax-

---

1. Section 381(a) (1) provides in pertinent part:

"(a) General Rule.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b) (2); or

\* \* \* \* \*

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c)."

Subsection (c) (1) provides certain conditions and limitations on (a) (1) and need not be set forth.

2. Section 382(a) (1) provides:

"(a) Purchase of a corporation and change in its trade or business.—

(1) In general.—If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount

payer in 1955 because Oronogo did not continue to carry on a trade or business after its acquisition which was substantially the same as it carried on before such acquisition.[3] Thus Oronogo did not have these losses available when it was liquidated by taxpayer.

The principal factual issue litigated below may be stated as follows: Was Oronogo engaged in a trade or business at the time of its acquisition by taxpayer on October 14, 1955, and did it continue to carry on substantially the same trade or business thereafter as it conducted prior to the acquisition. An interrogatory stating a similar question was submitted to the jury and it answered the question in the affirmative. Whether this finding by the jury can be supported by any substantial evidence is the question to decide; the government contending the evidence was insufficient as a matter of law to sustain the verdict.

■ In reviewing the record, we are mindful that the jury verdict must not be preempted unless it has no basis in fact. Insufficiency of the evidence is a ground for directing a verdict or granting a new trial, Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147, and see Vol. 2B Barron and Holtzoff, § 1075. But, as we said in United States v. Hess, 10th Cir., 341 F.2d 444, " * * * to be insufficient to support a verdict, the evidence must all be one way from which only one reasonable inference can be drawn." In this regard, the evidence must be viewed in a light most favorable to the party against whom a motion is made and he must be given the benefit of all inferences fairly drawn

therefrom. Commercial Standard Insurance Co. v. Feaster, 10th Cir., 259 F. 2d 210.

With these principles in mind, we will review the facts. Oronogo was a Missouri mining corporation engaged in the mining of lead and zinc principally in Southwest Missouri. Prior to its acquisition by the taxpayer in 1955, its stock was owned by Guy and Georgia Waring and their daughter, who was the wife of G. J. Fenix, a principal stockholder of the taxpayer corporation. From the time of its inception in 1936 until some time around 1948 and 1949, Oronogo mined lead and zinc in the so-called Oronogo mining district near Joplin, Missouri. Additionally, it conducted a coal mining operation near Bates, Arkansas, at least until 1951. While Oronogo performed the mining operation, the land it mined was leased to Guy and Georgia Waring. Although the company may have been initially profitable, poor economic conditions in the lead and zinc mining industry after World War II precipitated by a declining market price forced Oronogo to curtail much of its former activity. But Oronogo was not alone; expert testimony revealed that most of the mining in the area was suspended around 1947 and 1948. Shortly after this, in no event later than 1950, the mines in the district including the mines of Oronogo were allowed to fill with water and the evidence conclusively bears out that the water was never removed from the mines.

Shortly after World War II, Oronogo's profit and loss situation reflected consistent annual net operating losses which continued until its purchase by tax-

of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such

corporation to such taxable year and subsequent taxable year shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years."

3. The 1957 loss would appear to be available to taxpayer under § 381(a) (1) notwithstanding the provisions of § 382 since it was incurred after the stock acquisition.

payer.[4] 1949 was the last year Oronogo had any substantial ore sales. Of the $67,936 gross receipts in that year, ore sales accounted for about $50,000 and gravel sales for the balance. The tax return listed ore mining as the company's principal business. In 1950, ore sales slipped to only $167.04 and gravel sales rose to $27,291.64. The return that year showed ore mining and quarry as the principal business. Ore sales in 1951 were only $56.08 and gravel sales were about $30,000. 1951 was the last tax year Oronogo reported ore sales. The nature of the gross receipts in 1952 is not known. In 1953, only sale of gravel and chat was reported which totalled $33,662.-44. One significant factor occurred in 1953. Whereas prior returns reflected the nature of the company business as ore mining and quarry, the 1953 return dropped ore mining and only listed operation of a gravel quarry.

The 1954 return again listed the principal business activity as operating a gravel quarry. Gross income consisted of $3,154.00 of equipment sales and slightly over $4,000 of income derived from equipment rental, scrap sales, and interest earned. The 1955 return showed income of $4,315.00 for sale of scrap and miscellaneous receipts of $2,060.33. Subsequently, an amended return was filed for the year showing net gains on sale of assets of $25,402.61 and a taxable income for the year of $18,485.20. The 1950 net operating loss was then carried over the year to offset the gain. In 1956, Oronogo changed its accounting period to a fiscal year ending October 31 to coincide with the fiscal year of taxpayer. Oronogo's return for this ten month period shows taxable income of $33,596.09 based solely on equipment sales and rentals, completely offset by carryover losses from 1951–1952. The return for 1957 was Oronogo's final corporate return since it was liquidated in the year. It reported $2,953.14 on sale of supplies, rental income of $13,419 and a loss on an asset sale of $1,980.66, making a gross of $14,391.48 with expenses of $14,712.03, leaving another net loss of $320.55.

While Oronogo's tax returns give some idea of its activities, they by no means tell the whole story. Apparently in May, of 1952, Mr. Waring, acting for Oronogo, engaged General Steel Products Company to sell a substanial part of Oronogo's assets including the equipment used in the coal mining operation in Bates, Arkansas. Mr. Kirk of General Steel Products Company testified that he was authorized to sell between eighty and ninety per cent of Oronogo's assets but that he was only successful in selling about ten per cent. He did relate however that the company trucks were not listed with him. Another factor regarding Oronogo's equipment bears mentioning. During the time after 1951, much of the equipment was located on property belonging to the American Zinc Lead and Smelting Company which had leased land in the mining district.

On August 12, 1953, the minutes of Oronogo's board of directors reveal a resolution to dissolve the company.[5] The

---

4. Oronogo's federal income tax returns for its taxable years beginning in 1947 and ending in 1955 reflect the following net operating losses.

| | |
|---|---|
| 1947 | $31,604.65 |
| 1948 | 86,330.78 |
| 1949 | 80,891.22 |
| 1950 | 22,256.47 |
| 1951 | 23,469.48 |
| 1952 | 22,574.97 |
| 1953 | 28,222.80 |
| 1954 | 10,441.73 |
| 1955 | 6,917.41 |

While the 1955 return originally showed the loss above, an amended return reported taxable income of $18,455.20 from equipment sales. This was offset by a net operating loss carryover from 1950.

5. The resolution read in pertinent part:

"Whereas, Earl Toutz and William Snapp have recently purchased the Company's sand and gravel plants located on the American Zinc Lead and Smelting Company's chat pile on the Frisco Tracks near Oronogo, together with the machinery, equipment and supplies used in connection therewith; and

"Whereas, the Company has disposed of its last business operation, and there appears to be no further reason for the continuance of the corporate business and/or existence; * * *."

directors then resolved that the company be dissolved, that the remaining assets be liquidated, and that the company transact no further business except to wind up its affairs. On September 25, 1953, articles of dissolution were filed with the State of Missouri.

Sometime in early 1955, the Potter and Sims Mining Company which had leased land adjoining the leases owned by Guy Waring, attempted to purchase the leases and Oronogo's remaining equipment, with a view toward resuming mining activity in the area. Potter and Sims offered $50,000 for Oronogo's stock and leases plus the usual royalty and overriding royalty. Apparently the main reason Potter and Sims Company wanted the Waring leases was to enable them to pump all the water out of the area prior to mining. The nature of the underground water in the mines is such that one cannot de-water his mine without also de-watering the land of his neighbor, and Potter and Sims Company wanted to make sure they could mine all the area they de-watered. Expert testimony did opine that had the water been removed, profitable mining operations could have resumed. The testimony seemed to be that it would take from sixty to one hundred twenty days to de-water the area at a cost of approximately $64,000.

On October 14, 1955, the stockholders of Oronogo sold their stock to the taxpayer for $30,000. Three days prior to the stock sale, the directors of Oronogo rescinded the previous dissolution resolution and at a final directors' meeting they authorized Oronogo to redeem a considerable amount of the stock owned by Guy Waring and his wife. Guy Waring and his wife then assigned their leases to G. J. Fenix of the taxpayer corporation.

The facts up to this juncture represent Oronogo's activities prior to its acquisition by the taxpayer corporation. From the standpoint of its tax return for its first fiscal year after becoming a subsidiary of taxpayer, we have seen that its gross income of $33,000 plus was derived exclusively from sale of equipment and equipment rentals. The rent income was largely from taxpayer. Prior to its acquisition, Oronogo maintained two permanent employees, a mechanic and a bookkeeper. After the stock purchase, Oronogo's books and records were moved to Tulsa, Oklahoma, which is taxpayer's home, and taxpayer's personnel thereafter kept the books. Oronogo had no other employees in Tulsa. Some of Oronogo's remaining equipment was shipped by taxpayer to Alabama in 1956 to be used on taxpayer's construction projects there. In 1957 more of the equipment was shipped to a taxpayer project in New Jersey. The other equipment was removed to Tulsa.

Shortly after the stock purchase in 1955, taxpayer installed an electric water pump in a mine it owned about twelve miles from Oronogo district where Oronogo Company had mined, apparently hoping to de-water the mine and commence operations. However, the pumping ceased after several months and was never resumed and no mining was ever done there. There is also evidence that Potter and Sims Company again tried to purchase Oronogo's assets and leases this time from taxpayer or to form a joint venture, but their efforts met with no success.

It seems to be undisputed that much of the equipment still possessed by Oronogo at the time of its acquisition would or could be utilized by taxpayer in its excavation operation or construction. However, Mr. Scisson, a principal officer of the taxpayer, testified unequivocally that while taxpayer corporation owned some mining leases during the period in question, it operated no commercial mines. He further stated that Oronogo was not engaged in mining at the time of acquisition, and that the only mining activity in the area after the stock purchase was the previously referred to attempt to de-water a mine owned personally by Mr. Fenix which was terminated because the water was not receding and zinc prices remained depressed. Mr. Scisson further testified that the principal purpose in acquiring taxpayer was to

get back into the mining operation and to get Oronogo's equipment. He also admitted knowing of the tax advantage of Oronogo's net operating losses and described Oronogo as a mining company on a stand-by basis.

There was an abundance of testimony in the record elicited from qualified mining engineers both for the taxpayer and the government. One such expert for the taxpayer stated that the lead and zinc mining industry was highly cyclical; that when prices go up, the small operators like Oronogo may resume operations profitably. He further testified that merely because mines are flooded doesn't preclude future operations; however, he cautioned that Oronogo would not have been able to resume operations unless the whole mining area was de-watered which meant they would have to joint venture with other mines to pump the water.

Again somewhat in this light, Leonard Parker, a mining engineer, testified that it is not uncommon in the area when prices are depressed for a company to keep key personnel and retain its equipment in order to resume operations on very short notice, i. e., a week or two weeks should prices rise. When asked the question, what does a mining company do with its equipment during a period of shut down, he answered, "He leaves it intact, the major portion of his equipment. * * * But, he leaves all of his operating facilities and his key personnel intact. That's the time that they do research and project for future operations."

Mr. Parker was hired by Potter and Sims Mining Company to evaluate some of the land in the mining area including that formerly mined by Oronogo and in his opinion the land could be rehabilitated and operated profitably. He also recalled advising Potter and Sims Company that it could not mine land adjacent to that mined by Oronogo without Oronogo's co-operation in pumping out the water. Apparently it was this advice that prompted Potter and Sims Company to negotiate for the sale of Oronogo.

By its motion for judgment notwithstanding the verdict and assignment of errors, appellant has presented for decision whether or not as a matter of law, Oronogo continued to carry on a trade or business substantially the same as that before its purchase by taxpayer on October 14, 1955. However, appellee taxpayer argues that the government has not preserved this issue for our determination. Specifically, appellee contends that the government has sought to enlarge its motion for directed verdict by its motion for judgment notwithstanding the verdict and that this is improper. Taxpayer states the only issue for review is whether Oronogo's filing of the Articles of Dissolution constituted conclusive evidence that Oronogo was not carrying on a trade or business.

■■ While we agree with the taxpayer that a motion for judgment notwithstanding the verdict may not enlarge or assert new matters not presented in the motion for directed verdict,[6] we believe the motion for directed verdict was sufficient to encompass the position now maintained. At the close of all of the evidence, the government moved for a directed verdict, "on each issue in this case". Stating further, the government feels that the failure to carry on a trade or business is conclusively established by the filing of the Articles of Dissolution. In arguing this motion, government counsel stated in part, "That the filing of the Articles of Dissolution are conclusive as to whether or not this corporation was carrying on a trade or business and that when these Articles of Dissolution are taken and the other facts of this case subsequent to the filing date of those Articles of Dissolution, there's no other reason (sic) inference that could be drawn from the facts other than that this corporation was winding up its affairs

6. See Vol. 2B Barron & Holtzoff, § 1079. Notice that Rule 50(b) does not say judgment notwithstanding the verdict but to

have judgment entered in accordance with the motion for directed verdict.

and we move for a directed verdict on that issue." The motion was denied.

■ There is no doubt that the government's motion could have been more accurately stated, however, we believe under the circumstances it did present for determination whether Oronogo was engaged in a trade or business or whether it had ceased its activities and was winding up its affairs. Certainly as part of its motion the government laid great stress on the fact that Articles of Dissolution had been filed, but it also relied on the other facts to show the company was not engaged in a trade or business. Technical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position. Virginia-Carolina Tie & Wood Co. v. Dunbar, 4th Cir., 106 F.2d 383. We believe the motion here satisfied that requirement and was sufficient to form a basis for the motion for judgment notwithstanding the verdict. See Lewis v. Nelson, 8th Cir., 277 F.2d 207.

■ § 382 disqualifies a net operating loss where three conditions are met: (1) An increase of at least 50-percentage points in the stock ownership of a corporation by a prescribed number of persons within a taxable year beginning after June 22, 1954; (2) the increase in ownership is attributable to purchases of the stock; and (3) the corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the stock. The parties agree the first two conditions are met, it is the third condition with which we must deal. The language trade or business and its substantial continuity is fraught with uncertainty. The legislative history of the section provides little

help. See C. I. R. v. Goodwyn Crockery Company, 6th Cir., 315 F.2d 110. We do know the section was enacted to prevent "trafficking in corporations with operating loss carryovers." [7] § 129 of the 1939 Code, which was the forerunner of § 269 denying loss carryovers where the principal purpose of the acquisition was to evade the payment of tax, had proved ineffective due to the difficulty of proving the state of mind of the parties to the transfer. Congress apparently sought in § 382 a more objective test to determine when and what extent loss carryovers would be allowed. See H. F. Ramsey Co., 43 T.C. 500. But the answer is by no means an easy one.

Judicial interpretation of § 382 has been slow. The cases that have considered a problem similar to ours generally take the position that once a business becomes inactive and is discontinued, a stock purchase followed by a reactivation of the former business will meet the third requirement of § 382 and the loss carryovers will be disallowed. See Glover Packing Company of Texas v. United States, Ct.Cl., 328 F.2d 342; Fawn Fashions, Inc., 41 T.C. 205; and compare H. F. Ramsey Co., supra. As was said in the Glover case, 328 F.2d at page 348, concerning the trade or business continuity requirement, "It hardly envisages the resumption of an operation carried on in the distant past, * * *. Nor does it envisage the resuscitation of a business long since discontinued."

While the Commissioner's regulations were not promulgated until 1962 which was nearly eight years after the statute, § 1.382(a)–1(h) (6) clearly takes the position that a corporation may not carry over operating losses after a stock purchase if it was inactive at the time of the ownership change.[8] This portion of

---

7. H.R.Rept. # 1337, 83rd Cong., 2d Sess. 42 (1954). 3 U.S.Code Cong. & Adm. News, p. 4067.

8. Treas.Reg. 1.382(a)–1(h) (6) provides: "A corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership. Thus, if the corporation is inactive at the time of such an increase and subsequently is reactivated in the same line of business as that originally conducted, the corporation has not continued to carry on a trade or business substantially the same as that conducted before such increase in stock ownership."

the regulation appears entirely compatible with the statute and has in fact been upheld by the Tax Court in Fawn Fashions, Inc., supra, and the Court of Claims in Glover Packing Company of Texas v. United States, supra.

Taxpayer argues this regulation is inapplicable because not promulgated until after the liability arose in this case, relying on language by the Sixth Circuit to that effect in C. I. R. v. Goodwyn Crockery, Inc., supra. It is true the Sixth Circuit refused to apply the regulation retroactively but under a circumstance different from this, for in Goodwyn the regulation was not even enacted at the time of the Tax Court decision. In the instant case, the regulations were in effect before the trial but the court specifically declined to instruct on any part of the regulations.

■ While we by no means rest our decision on this regulation alone, we have no doubt of the Commissioner's authority to make his regulations retroactive which he apparently has done here.[9] At any rate, as early as 1958, the Commissioner issued Revenue Ruling 58–9, 1958, Cum. Bull. 190, which is nearly identical to § 1.382(a)–1(h) (6). Thus, the taxpayer had a warning of things to come.

The question in this case under § 382 (a) appears twofold: Was Oronogo engaged in a trade or business prior to the stock transfer and if so was the business substantially carried on thereafter? It seems clear that a corporation could not carry on a trade or business substantially the same as theretofore conducted if the corporation was not engaged in such a trade or business at the time of the requisite change in stock ownership.

What was the trade or business of Oronogo prior to October 14, 1955? By the charter it was created to engage in the lead, zinc and coal mine business. Yet, no actual mining of any kind was performed after 1951. The lead and zinc mines were flooded with water and the coal mine was shut down. Was it engaged in the operation of a gravel quarry and the sale of chat? Apparently it so considered itself when in its 1953 income tax return it listed operation of a gravel quarry as its principal business dropping the word mining altogether. But the gravel quarry and chat business certainly ended in 1953 for no further operation of this nature continued after 1953 and no income from chat sales was reported after 1953. Additionally the Articles of Dissolution filed August 12, 1953, clearly recite that Oronogo had sold its sand and gravel plants together with the equipment, machinery and supplies used in that business.

Taxpayer does point to the fact that during 1955, Oronogo was at least negotiating with Potter and Sims Company for resumption of mining,[10] that it was maintaining its equipment and incurring expenses, viz., insurance, taxes, depreciation and wages for two employees and had income from sales and rentals. Certainly the fact that the company was incurring some fixed expenses and filing tax returns doesn't mean it engaged in a trade or business. The expenses for the most part were to preserve the remaining equipment until it would be disposed of. As for the rentals and equipment sales, we find nowhere an argument made that Oronogo was engaged in the business of equipment sales and rentals. At any rate such an argument would carry little weight for the company was not maintaining an inventory for such purpose by replacing the equipment sold and rented. Furthermore, there is no doubt that at one time it held out between eighty and ninety per cent of its equipment, exclud-

9. § 7805(b), 26 U.S.C. provides:
"Retroactivity of regulations or rulings.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." See also Vol. 1, Mertens, § 3.25.

10. The negotiation seemed one sided for all we know is that Potter and Sims Company offered to purchase Oronogo's stock and the leases for $50,000 only to later sell its stock for $30,000 to taxpayer.

ing trucks, for sale to the public. As for rental income, neither the evidence nor the 1955 tax return discloses any rental income in that year.

Finally, taxpayer contends that even though the company was not engaged in extracting minerals in 1955, it was doing what many other mining companies in the area were doing, that is holding itself in readiness to resume operations should the market price of lead and zinc rise. The facts however are inconsistent with this argument. Oronogo's mines as well as the other mines in the area were flooded with water and it would take around $64,000 and from sixty to one hundred and twenty days to alleviate this factor. Keeping a mechanic to look after equipment can hardly be considered maintaining key mining personnel.[11] Nor do we find evidence that the company was exploring the possibility of resuming operations in a new locale. It had sold its chat and sand business in 1953, and although rescinded three days before its stock was purchased, Oronogo's directors approved Articles of Dissolution reciting unequivocally that there appears to be no further reason for continuing the corporate business or existence.

In any event, Oronogo's attempt to sell nearly all of its equipment is incompatible with the idea that it was merely standing by intending to resume operations should business factors improve. Had they been completely successful in selling equipment, they would have been unable to resume operations short of repurchasing necessary equipment. We hardly believe Congress intended § 382 (a) to turn on such a fortuitous circumstance. See Euclid Tennessee, Inc. v. C. I. R., 41 T.C. 752.

The evidence in totality leads only one way which is that prior to October 14, 1955, Oronogo was no longer engaged in any trade or business and the jury verdict to the contrary must be set aside as a matter of law. Having reached this result, we need not pass upon the activities of Oronogo after its acquisition by taxpayer although the facts clearly indicate no business was ever resumed prior to liquidation.

The judgment is reversed and the case is remanded with directions to enter a judgment consistent herewith.

---

11. Apparently Oronogo had from between 100–150 employees until activity was curtailed in 1947–1948.