DAVID J. BUTKA AND SABINE I. BUTKA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26951-86.        Filed July 26, 1988.

*John B. Jones, Jr.,* and *Robert A. Green,* for the petitioners.

*Robert W. Sadowski,* for the respondent.

## OPINION

RAUM, *Judge:* The Commissioner determined a deficiency in petitioners' 1983 income tax in the amount of $457. The husband-petitioner had gone to Europe on an assignment by his employer to perform services for a subsidiary of the employer. Upon completion of the assignment some 2 years later, he returned to the United States to resume work in this country for the employer. Petitioner incurred moving expenses upon returning to the United States but was then reimbursed therefor in accordance with his employer's commitment at the time he undertook the European assignment. Such reimbursement was treated as "foreign earned income" and properly excluded from petitioner's gross income pursuant to section 911(a) of the Code.[1] The question presented is whether deduction of such expenses, otherwise authorized by section 217(a) of the Code, must be disallowed by reason of section 911(d)(6) as being "properly

---

[1]Unless otherwise indicated herein all references to the Code relate to the Internal Revenue Code of 1954.

allocable to or chargeable against amounts excluded from gross income under [section 911(a)]".

The facts have been stipulated. Petitioners David J. Butka and Sabine I. Butka, husband and wife, are U.S. citizens who resided at Wolboldstr. 4, 7032 Sindelfingen, West Germany, at the time the petition herein was filed. Their legal residence when they are in the United States is New York State. For the taxable year 1983, the petitioners (who are cash-basis taxpayers) filed a joint tax return with the Internal Revenue Service Center at Philadelphia, Pennsylvania.

Petitioner David J. Butka (hereinafter referred to as petitioner) has been an employee of either International Business Machines Corp. (IBM), a New York corporation, or one of its subsidiaries, since March 3, 1977. Before May 30, 1981, petitioner was employed by the Systems Products Division of IBM in Endicott, New York, as a production test engineer. From May 30, 1981, until September 3, 1983, petitioner, on assignment by IBM, was employed by IBM Deutschland GmbH (IBM Germany), a West German subsidiary of IBM, as a production test engineer in Boeblingen, Federal Republic of Germany (Germany or West Germany). On September 3, 1983, petitioner moved back to the United States to work as a senior production test engineer for IBM, again in Endicott, New York. He remained a full-time employee of IBM in Endicott until July 28, 1984, when he began a second assignment with IBM Germany.

At the time petitioner began his May 30, 1981, through September 3, 1983, assignment in Germany, it was "anticipated that [the] international assignment * * * [would] be for a period of two years," although the length of the assignment would be "subject to change at the discretion of IBM".

The terms and conditions of petitioner's employment in Germany provided that IBM would reimburse him for expenses incurred both in moving to Germany and in moving back to the United States. IBM agreed to reimburse petitioner for "the cost of shipping up to 1,000 lbs. * * * of personal and household effects" to Germany and "for shipping costs for up to 1,200 lbs. for the return shipment upon completion of assignment".

IBM promised to reimburse petitioner's moving expenses in order to induce him to accept the foreign assignment. The reimbursement was not in any way contingent either upon petitioner's continued employment with IBM after petitioner's return to the United States or upon his performance of services in the United States after his return.

Although reimbursement of the moving expenses incurred in returning to the United States was not conditioned on petitioner's continued employment with IBM, the terms of his assignment in Germany did condition such reimbursement upon his completion or substantial completion of his foreign assignment. It was IBM policy that, if an employee assigned overseas voluntarily resigned, its obligation[2] to reimburse him for the expenses of his return to his home country would depend on the following considerations:

   a. The extent to which the employee has met his commitment to WTC, e.g., performance, time in assignment and past record with WTC.
   b. The reason for his resignation.
   c. Extenuating family circumstances.
   d. Local law.

On September 3, 1983, petitioner completed his assignment in Germany and moved back to the United States to work for IBM in Endicott, New York, as a senior production test engineer. During 1983, in connection with his return to the United States, petitioner incurred $2,636.49 of storage and transportation expenses in moving household goods and personal effects, and IBM reimbursed him in full during the same year for these expenses. IBM billed these expenses to IBM Germany.

On his 1983 U.S. individual income tax return, filed jointly with his wife, petitioner reported income earned from salary, interest, and dividends, aggregating $60,087, and then subtracted or "excluded" $34,014 from his income as "foreign earned income". Included within the $34,014 of excluded foreign earned income was the $2,636 (rounded to

---

[2]The stipulation of the parties refers to the obligation as that of IBM. However, some of the materials in the record seem to refer, without clarification, to "IBM WTC" or simply to "WTC" in respect of the obligation to the employee. In view of the stipulation, we treat the obligation as that of IBM, regardless of any internal relationship between IBM and any entity controlled by it and regardless of any technical relationship between the employee and such entity.

the nearest dollar) reimbursement by IBM of petitioner's expenses of moving from West Germany back to the United States. It is stipulated that the moving expense reimbursement was properly excluded from petitioner's gross income as foreign earned income.

Also on his 1983 return, petitioner deducted the $2,636 expenses of moving back to the United States. Apart from the arrangement between petitioner and IBM in respect of his foreign assignment and the reimbursement of the moving expenses back to the United States that were excluded from petitioner's gross income as foreign earned income, it is undisputed that such moving expenses from Germany to this country were deductible under section 217 of the Code as incurred to "commence" work for IBM in Endicott, New York. The Commissioner disallowed the claimed moving expense deduction, on the stated ground that the expenses were "attributable to foreign source excluded income".

The Government's position is based upon section 911(d)(6) of the Code, which provides:

(6) DENIAL OF DOUBLE BENEFITS.—No deduction * * * from gross income under this subtitle * * * shall be allowed to the extent such deduction * * * is *properly allocable to or chargeable against* amounts excluded from gross income under subsection (a). [Emphasis supplied.]

Subsection (a) referred to above provides:

(a) EXCLUSION FROM GROSS INCOME.—At the election of a qualified individual * * * there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year—
    (1) the foreign earned income of such individual * * * [3]

As applied to the situation before us, section 1.911-6(b)(1) of the Income Tax Regulations deals with the relationship between the moving expense deduction of section 217 of the Code and the provisions of section 911(a) and (d)(6). It explicitly disallows the deduction in situations like the one

---

[3]The election referred to in sec. 911(a) apparently relates to the taxpayer's option to treat the item as excludable from gross income or to include it in gross income but claim a foreign tax credit in respect of foreign tax paid allocable to such item. Cf. Staff of the Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 214, 1976-3 C.B. 226. In this case, it is not disputed that petitioner elected to exclude the amount from gross income.

before us, and there is no dispute that if those regulations are valid, the Government's position must be sustained.

In our judgment, as we construe the statutory provisions themselves, wholly apart from the regulations, section 911(d)(6) precludes the deduction. Moreover, if there be any residual doubt as to such result, we think that the regulations interpreting the statutory provisions are not inconsistent therewith and must be upheld. We proceed to consider each of these aspects of the case separately.

1. *Section 911(d)(6) of the Code forbids the deduction.*—We begin with section 217(a) which is the basis for the claimed deduction. It provides for a deduction of moving expenses paid or incurred "in connection with the commencement of work by the taxpayer as an employee * * * at a new principal place of work". If this were merely a case of a taxpayer departing from Europe in order to commence work in the United States, and nothing more, section 217(a) would call for the deduction. Such result plainly emerges from the mirror image case of *Hughes v. Commissioner*, 65 T.C. 566 (1975).

In *Hughes*, the taxpayer incurred expenses in moving *from* the United States in order to work in a foreign country; and to the extent that such expenses were "allocable to or chargeable against" his earnings in that country that were excludable from gross income as foreign earned income, this Court held that the disallowance of the deduction was required by the relevant statutory provisions now appearing in section 911(d)(6).[4] By parity of reasoning, petitioner argues that the moving expenses herein are allocable to or chargeable against earnings to be derived at the place of destination, in the United States—no part of which is excludable from gross income. Accordingly, the argument continues, the deduction must be allowed as specifically authorized by section 217(a). If that were all there is to this case, petitioner's position would be unassail-

---

[4]*Hughes* was followed in *Narain v. Commissioner*, T.C. Memo. 1983-701, 47 T.C.M. 402, 52 P-H Memo T.C. par. 83,701; *Morley v. Commissioner*, T.C. Memo. 1982-586, 44 T.C.M. 1337, 51 P-H Memo T.C. par. 82,586, affd. without published opinion 718 F.2d 1092 (4th Cir. 1983); *Painter v. Commissioner*, T.C. Memo. 1976-164, 35 T.C.M. 731, 45 P-H Memo T.C. par. 76,164. Cf. *Roque v. Commissioner*, 65 T.C. 920 (1976). A contrary result had previously been reached in two earlier cases that were reversed on appeal. *Hartung v. Commissioner*, 55 T.C. 1 (1970), revd. 484 F.2d 953 (9th Cir. 1973); *Markus v. Commissioner*, T.C. Memo. 1971-313, revd. without published opinion 486 F.2d 1314 (D.C. Cir. 1973).

able. But there is more, and more of pivotal significance. *Hughes* is distinguishable, and a contrary result is called for here.

By reason of the agreement between petitioner and IBM when he departed from the United States, he became entitled to reimbursement of moving expenses incurred in returning to this country upon completion of his foreign assignment. Although the IRS originally took the position in a similar case that such reimbursement should not be treated as excludable foreign earned income, it failed in the attempt. Indeed, in that case involving another employee of IBM, this Court held, following *Dammers v. Commissioner,* 76 T.C. 835 (1981), that such reimbursement did qualify as compensation for personal services performed without the United States and was excludable from gross income as "foreign earned income" under section 911(a). *Redding v. Commissioner,* T.C. Memo. 1982-111, 43 T.C.M. 719, 51 P-H Memo T.C. par. 82,111. The IRS appears to have accepted that result, for it is stipulated that the reimbursement of the moving expense here in issue (back to the United States) "was excludible from petitioner's gross income as foreign earned income". The taxpayer in the present case is represented by the same lead counsel who appeared for the taxpayer in *Redding.* Counsel there successfully persuaded this Court to hold that IBM's reimbursement of its employee's moving expenses incurred in returning to the United States after an overseas assignment should be classified as foreign earned income exempt from tax. We are satisfied that the essential difference between *Redding* and this case is only superficial and really nonexistent. Petitioner cannot have it both ways.

To be sure, as argued on behalf of petitioner, this case involves a deduction under section 217 for expenses incurred, whereas *Redding* involved the classification of a reimbursement as excludable foreign earned income under section 911(a). The difference, however, is of no consequence in the context of this case. The heart of this case is section 911(d)(6), which disallows a deduction that is properly "allocable to or chargeable against amounts excluded from

gross income" under section 911(a).[5]

Here we have moving expenses the reimbursement of which was excluded from gross income. The expenses and their reimbursement are inextricably linked together. If the words "allocable to or chargeable against" mean anything, they embrace the moving expenses herein. These expenses by reason of their inseparable relationship to their reimbursement were certainly "allocable to or chargeable against" foreign earned income that was excluded from petitioner's gross income. In every real sense, the moving expenses were the cost of realizing the income represented by the reimbursement thereof which is classified as foreign source earnings. There is thus a "sufficient nexus" to that reimbursement to require the allocation. Cf. *Christensen v. Commissioner*, 71 T.C. 328, 331 (1978), affd. 601 F.2d 75 (2d Cir. 1979). Only by ignoring the inseparable link between the reimbursement and the expenses can one conclude that the claimed deduction was not allocable to or chargeable against petitioner's excluded foreign earned income, the result sought by petitioner. To do so would offend good sense, particularly in the light of the well-established principle that deductions and exemptions from taxation are to be narrowly construed.[6] Cf. *Bingler v. Johnson*, 394 U.S. 741, 752 (1969); *Commissioner v. Jacobson*, 336 U.S. 28, 49 (1949); *United States v. Stewart*, 311 U.S. 60, 71 (1940); *Helvering v. Northwest Steel Mills*, 311 U.S. 46, 49 (1940); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); *United Telecommunications, Inc. v. Commissioner*, 589 F.2d 1383, 1387-1388 (10th Cir. 1978).

We must keep clearly in mind that section 911(d)(6) is concerned with the denial of double tax benefits. To accept petitioner's position would be to allow petitioner to enjoy

[5]The pertinent language of sec. 911(d)(6) has been in our tax law for many years. Prior to sec. 111(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, which substantially recast the structure of sec. 911 of the Code, the pertinent language appeared in sec. 911(a), and was present in substantially the same wording not only in the 1954 Code from the beginning but also in sec. 116(a) of the 1939 Code, and prior thereto in various revenue acts all the way back to the Revenue Act of 1926. Sec. 213(b)(14) of the 1926 Act provided that an "individual shall not be allowed as a deduction from his gross income any deductions *properly allocable to or chargeable against amounts excluded from gross income* under this paragraph [i.e., earned income from sources without the United States received by a bona fide nonresident citizen of the United States for more than 6 months of the taxable year]. [Emphasis supplied.]"

[6]It was even stated many years ago that "a well founded doubt is fatal to the claim [of tax exemption]". *Bank of Commerce v. Tennessee*, 161 U.S. 134, 146 (1896).

the deduction of the expenses while at the same time allowing him to shelter the reimbursement thereof from tax. Petitioner argues that in exempting foreign earned income from tax, Congress was concerned with encouraging foreign trade and could therefore have been quite willing to permit such a double benefit. We do not doubt that there may have been some general undefined desire to promote foreign commerce. But that is a far cry from leaping to the conclusion that Congress intended any double tax benefit. Of course, if Congress had wished to provide for such a bonanza it could have done so. Indeed, the present situation stands in marked contrast to what Congress in fact did in 1978 when it explicitly added the words "other than the deductions allowed by section 217 (relating to moving expenses)" to the statutory prohibition of any deduction "properly allocable to or chargeable against amounts excluded from gross income".[7] The words "other than the deductions allowed by section 217" were deleted by Congress in 1981, when the language of section 911(a) denying double tax benefits was transferred to section 911(d)(6) now before us. Sec. 111, Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 193-194. Had Congress intended to confer the extraordinary double tax benefit which petitioner seeks here, it certainly knew how to do it.

Moreover, we have not been directed to any committee report or any other material in the legislative history, either before or after the 1978 and 1981 statutes clearly indicating any such congressional objective. In the light of such unambiguously stated purpose pointing in the opposite direction in section 911(d)(6), we find no provision in the Code depriving section 911(d)(6) of its plain meaning. Certainly, section 217 does not do so, because section 911(d)(6) explicitly denies a deduction coming within its terms, notwithstanding that the deduction is authorized elsewhere in the Code. The very underlying assumption of section 911(d)(6) is that it precludes a deduction or benefit

---

[7]Sec. 202(a) of the Foreign Earned Income Act of 1978, Pub. L. 95-615, 92 Stat. 3099, amended sec. 911(a) of the Code which then contained the provisions now in sec. 911(d)(6) before us here. See note 5 *supra*. The original amendatory provisions of the 1978 legislation referred to "sections 217", but that obvious error was soon corrected to refer to "section 217" in the singular by sec. 108(a)(1)(D)(ii) of the Technical Corrections Act of 1979, Pub. L. 96-222, 94 Stat. 224.

otherwise permitted by the statute. If there is to be an exception for moving expenses in circumstances such as are involved here, it should clearly appear in the Code or at the very least in some unambiguously expressed manner in a committee report.

The contention that *Hughes* calls for the result sought by petitioner is wide of the mark. We fully recognize that in the context of that case, moving expenses were allocated to income to be earned at the foreign destination that would be excludable from gross income. From that conclusion, it is argued here that the moving expenses in this case must be allocated to taxable U.S. income to be earned upon petitioner's return to this country. But here we have a definitive classification of the very income generated by those expenses (the reimbursement thereof) as excludable "foreign earned income", rather than taxable income allocable to the place of destination, in the United States. Nothing of the sort was present in the *Hughes* case, and language and approach in the opinion therein that may have been wholly appropriate in that case should not be carried over blindly to the entirely different situation before us now. To construe section 911(d)(6) otherwise in this case would fly in the face of the clear purpose of the words "properly allocable to or chargeable against" the foreign earned income that is excluded from gross income, as that language has appeared for many years in our revenue law all the way back to the Revenue Act of 1926. See note 5 *supra.*

Petitioner puts considerable stress upon the language of section 217(a) which allows a deduction for moving expenses "in connection with the commencement of work * * * at a new principal place of work". He calls attention to the stipulation of the parties that he "moved back to the United States in order to ·commence work as a Senior Production Test Engineer for IBM in Endicott, New York". Since petitioner was an employee of IBM all along, merely on a temporary assignment to a subsidiary of IBM in Germany, there could be some question whether his return to recommence work for IBM in the same city (Endicott, New York) comes within section 217(a) at all. However, we do not consider the point because there is no dispute between the parties that the deduction would be allowable,

apart from the allocation provisions of section 911(d)(6). The essential matter before us is the effect of section 911(d)(6).

Petitioner argues that the language of section 217 compels treating petitioner's claimed deduction as related to taxable U.S. income. We do not view the language of section 217(a) to be indicative of the proper allocation of the deduction for the purpose of section 911(d)(6) in circumstances like those present in this case. We find no indication that the language of section 217(a) upon which petitioner relies does anything more than provide the rudimentary definition of a business move and thereby set limits on what moves will support a deduction in the first instance.

Certainly, when section 217 was first enacted as section 213(a)(1) of the Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 50, there was no suggestion that the allowance of moving expense deductions "incurred * * * in connection with the commencement of work by the taxpayer" was meant to link the expenses to the subsequently earned income for purposes of the predecessor provisions of section 911(d)(6) (then contained in section 911(a)) or for any other purpose. Instead, the language was merely meant to give to new employees (and to employees who were not reimbursed for their moving expenses by their employers) a deduction for their moving expenses. This deduction would serve to equalize the treatment of new employees (and employees who were not reimbursed) with the treatment of reimbursed employees. For the latter group, the reimbursement of moving expenses had for some time been excluded from the taxpayer's gross income when it was considered to have been made "in the interest of the employer". H. Rept. 749, 58, 88th Cong., 1st Sess. (1963); S. Rept. 830, 71, 88th Cong., 2d Sess. (1964). To equalize the treatment of moving expenses, the section allowed the deduction of moving expenses by "new employees and employees who are not reimbursed for their moving expenses by their employers". H. Rept. 749, 59, 88th Cong., 1st Sess. (1963); S. Rept. 830, 71, 88th Cong., 2d Sess. (1964).

In that context, the original version of section 217 made clear that "No deduction shall be allowed under this section for any item to the extent that the taxpayer receives

reimbursement or other expense allowance for such item which is not included in his gross income". Sec. 213(a)(1), Pub. L. 88-272, 78 Stat. 51. The accompanying committee reports explicitly stated that "No deduction is provided under this provision for moving expenses for which the taxpayer receives reimbursements which are not included in his gross income". H. Rept. 749, 60, 88th Cong., 1st Sess. (1963); S. Rept. 830, 72, 88th Cong., 2d Sess. (1964). Only when section 82, I.R.C. 1954, providing that "There shall be included in gross income * * * payment for or reimbursement of expenses of moving" was added to the Code by section 231(b) of the Tax Reform Act of 1969,[8] was that provision of section 217 dropped. Sec. 231(a), Pub. L. 91-172, 83 Stat. 577-579. Thus, to the extent that any inference can be drawn as to the indications within section 217 for the proper allocation of moving expenses in the situation before us, that inference points more to an allocation of the expense to the excluded reimbursement or to foreign earned income than it does to the allocation to subsequently earned U.S. income as suggested by petitioner.

Petitioner also relies on one of the two "Conditions for Allowance" under section 217(c) to bolster his argument that moving expenses must be chargeable to subsequently earned income. The condition relied upon is that in section 217(c)(2) which requires that the taxpayer be employed full-time at the new principal place of work for a minimum period. This condition is cited as providing support for the linking of the moving expenses to income earned at the subsequent employment. Again, we do not see how this language in section 217 can be used to support the rule petitioner urges. The condition was added to the Code, along with the moving expense deduction in 1964, in order to "prevent individuals from taking temporary jobs in order to obtain the deduction of moving expenses". H. Rept. 749, 60, 88th Cong., 1st Sess. (1963); S. Rept. 830, 72, 88th Cong., 2d Sess. (1964). There is no indication that the limitation was meant to provide any guidance as to the proper allocation of moving expenses for purposes of section 911(d)(6).

---

[8]Pub. L. 91-172, 83 Stat. 579.

We could go on and on responding in exhausting detail to the seemingly endless series of competently crafted arguments in petitioner's brief. But when all the smoke has cleared, we are left with one dominant thing. Petitioner is here seeking the advantage of a double tax benefit—a result that section 911(d)(6) was plainly meant to forbid. Unless there is some clear provision in the Code authorizing such windfall, or at the very least, a clear statement in an authoritative part of the legislative history to the same effect, such double tax benefit is not available to petitioner. As previously indicated, *supra*, p. 118, we have not been directed to any such clear provision in the statute or any unambiguous indication in the legislative history justifying any such result, nor have we found any in our own research. Petitioner has already been accorded the privilege of excluding the reimbursement of the moving expenses from his gross income as exempt foreign earned income. He may not also take a deduction for those expenses.

2. *The regulations.*—We have already concluded above that section 911(d)(6) of the Code disallows the claimed moving expense deduction. Although resort to the applicable regulations was not necessary to reach that result, the regulations reinforce our conclusion, and, contrary to petitioner's contentions, we hold that they are valid as to all years to which they apply. After approval on behalf of the Secretary of the Treasury in December 1984, they were published in January 1985 as T.D. 8006, 1985-1 C.B. 224, 241, and were part of comprehensive final regulations relating to the treatment of income earned abroad by U.S. citizens. They were made effective for taxable years "beginning after December 31, 1981". The portion which undertakes to construe the statutory provisions before us in respect of moving expenses appears in section 1.911-6(b)(1) of the regulations. It provides:

(b) *Moving expenses—*(1) *In general.* No deduction shall be allowed for moving expenses under section 217 to the extent the deduction is properly allocable to or chargeable against amounts of foreign earned income excluded from gross income under section 911(a). If an individual's new principal place of work is in a foreign country, deductible moving expenses will be allocable to foreign earned income. *If an individual treats a reimbursement from his employer for the expenses of a move from a foreign country to the United States as attributable to*

*services performed in a foreign country under sec. 1.911-3(e)(5)(i), then deductible moving expenses attributable to that move will be allocable to foreign earned income.* If the individual is a qualified individual who elects to exclude foreign earned income under section 911(a), then some or all of *such moving expenses must be disallowed as a deduction.* [Emphasis supplied.]

Section 1.911-3(e)(5)(i), Income Tax Regs., referred to above, reads as follows:

(5) *Moving expense reimbursements*—(i) *Source of reimbursements.* For the purpose of determining whether a moving expense reimbursement is attributable to services performed within a foreign country or within the United States, *in the absence of evidence to the contrary,* the reimbursement *shall be attributable to future services to be performed at the new principal place of work.* Thus, a reimbursement received by an employee from his employer for the expenses of a move to a foreign country will generally be attributable to services performed in the foreign country. A reimbursement received by an employee from his employer for the expenses of a *move from a foreign country to the United States* will *generally* be attributable to services performed in the United States. For purposes of this paragraph (e)(5), *evidence to the contrary includes,* but is not limited to, *an agreement,* between the employer and the employee, *or a statement of company policy,* which is reduced to writing before the move to the foreign country and *which is entered into or established to induce the employee* or employees *to move to a foreign country.* The writing *must state that the employer will reimburse the employee for moving expenses incurred in returning to the United States regardless of whether the employee continues to work for the employer* after the employee returns to the United States. The writing may contain conditions upon which the right to reimbursement is determined as long as the conditions set forth standards that are definitely ascertainable and the conditions can only be fulfilled prior to, or through completion of, the employee's return move to the United States that is the subject of the writing. * * * [Emphasis supplied.]

There is no dispute that both regulations sections 1.911-6(b)(1) and 1.911-3(e)(5)(i) are precisely applicable to this case. Indeed, petitioner must rely upon section 1.911-3(e)(5)(i), Income Tax Regs., which in effect incorporates the decision in *Redding v. Commissioner, supra,* to classify the reimbursement of the moving expenses as foreign source income in order to be able to exclude that reimbursement from his gross income. But petitioner contends not only that regulations section 1.911-6(b)(1) is invalid, but also that it is particularly invalid as applied "retroactively" to petitioner's 1983 taxable year. Moreover, petitioner con-

cedes that section 1.911-6(b)(1), Income Tax Regs. (sometimes referred to herein as the regulation) would require a decision against him were it not for its asserted invalidity. We hold that it is amply authorized by statute and must be fully sustained.

Petitioner challenges the regulation as "unreasonable and plainly inconsistent with the language, structure, origin, and purpose of sections 911 and 217". Of particular concern to him is the regulation's perceived inconsistency with the wording of section 217 and with this Court's interpretation of the interaction between sections 217 and 911(a) under section 911(d)(6), as reflected in the line of cases headed by *Hughes v. Commissioner, supra,* especially when considered in light of Congress' "reenactment" of section 911(d)(6) after our interpretation of that section had become clear. We find the regulation to be reasonable and wholly consistent with both sections 217 and 911 and our cases interpreting those sections.

We have already carefully reviewed the *Hughes* case in the earlier part of this opinion, and, as we have there pointed out, *Hughes* does not call for any such comparable result here. Even if Congress could be considered as having reenacted the statute so as to incorporate the *Hughes* decision in the Code, it has certainly not incorporated a result that was not discussed or reached in *Hughes.* See *supra,* p. 119. The most that can be said about *Hughes* in this context is that there was some language or approach therein which, when read uncritically, could theoretically support a position that moving expenses must always be allocated to earnings to be received at the point of destination. We do not regard *Hughes* as having established any so-called inflexible "forward attribution rule".

The crucial question in every case is whether there is a double tax benefit that is prohibited by section 911(d)(6) of the Code. The regulations reveal a perceptive understanding of that basic approach. Thus, the second sentence of section 1.911-6(b)(1) of the regulations, *supra,* p. 122, faithfully follows *Hughes,* since the moving expenses dealt with in that sentence were allocable to excludable future earnings at the place of destination. But the third sentence relates to income (reimbursement of moving expenses) that is favor-

ably treated as excludable foreign source earnings (as permitted by regulations section 1.911-3(e)(5)(i)), with the result that allowance of a deduction for the moving expenses must be disallowed under section 911(d)(6). In this latter situation, the classification of the reimbursement of the expenses as foreign earned income precludes application of any "forward attribution rule" that would seek to allocate those expenses to future taxable U.S. earnings.

We note that section 1.911-3(e)(5)(i) of the regulations, upon which petitioner must rely to exclude the reimbursement of his expenses from his gross income, contains specific internal evidence that there is no such inflexible "forward attribution rule". It pointedly states that "in the absence of evidence to the contrary", the reimbursement shall be attributable to future services "to be performed at the new principal place of work". In isolation, those latter words could well mean that since petitioner's "new principal place of work" is the United States upon returning to this country, the reimbursement would be allocable to U.S. income and therefore could not be excluded from petitioner's income. But section 1.911-3(e)(5)(i), Income Tax Regs., goes on to state that evidence to the contrary includes an agreement or written statement before the employee's departure for the foreign country that the employer will reimburse him for moving expenses incurred upon returning to the United States—the very situation that we have here. Thus, petitioner must rely upon an exception to the general "forward attribution rule" for purposes of excluding the reimbursement from his gross income pursuant to regulations section 1.911-3(e)(5)(i). He cannot at the same time insist on an inflexible "forward attribution rule" in the companion provisions of section 1.911-6(b)(1), Income Tax Regs.

The Secretary of the Treasury is required generally by section 7805(a) of the Code to "prescribe all needful rules and regulations for the enforcement of this title [i.e., the entire Code]". Moreover, section 911(d)(8),[9] more precisely focused on section 911 itself, directs him to "prescribe such regulations as may be necessary or appropriate to carry out the purposes *of this section*". (Emphasis supplied.) We have

---

[9] In the Internal Revenue Code of 1986, the provisions were redesignated as sec. 911(d)(9).

no doubt that the regulation before us is reasonable, that it is fully in accord with the provisions of section 911(d)(6) which it undertakes to construe, and that it is in no way inconsistent with the Code.

The standards for judging the validity of regulations have been set forth many times. Of course, where a regulation is perceived as unreasonable and "fundamentally at odds with the manifest congressional design", it will not be sustained. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982); *United States v. Cartwright*, 411 U.S. 546 (1973). But unless the regulation under attack can be shown to be unreasonable and contrary to the relevant statutory provisions, it must be upheld. This principle has been stated in various formulations. Perhaps one of the most familiar of such formulations appears in *United States v. Correll*, 389 U.S. 299, 306-307 (1967), where the Court said:

we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. sec. 7805(a). In this area of limitless factual variations, "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." *Commissioner v. Stidger*, 386 U.S. 287, 296. The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner.

In *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477 (1979), the Supreme Court stated the appropriate line of judicial inquiry as follows:

In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose.

And in *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981), the Court summarized and more comprehensively announced its views as to the place held by regulations in the administration of our revenue laws:

[The] regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task "of administering the tax laws of the Nation." *United States v. Cartwright*, 411 U.S. 546, 550 (1973); accord, *United States v. Correll*, 389 U.S. 299, 307 (1967);

see 26 U.S.C. sec. 7805(a). We therefore must defer to Treasury Regulations that "implement the congressional mandate in some reasonable manner." *United States v. Correll, supra,* at 307; accord, *National Muffler Dealers Assn. v. United States,* 440 U.S. 472, 476-477 (1979). To put the same principle conversely, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); accord, *Fulman v. United States,* 434 U.S. 528, 533 (1978); *Bingler v. Johnson,* 394 U.S. 741, 749-751 (1969).

Moreover, where in addition to the general authority of section 7805(a) to promulgate regulations, Congress has given the Secretary particular authority to do so in respect of certain specified provisions of the Code (as it has done here in section 911(d)(8)), the Supreme Court in the *Portland Cement* case went on to state (p. 169) that its "customary deference to Treasury Regulations is particularly appropriate".

Regardless of what formulation of the applicable principle is taken into account here, the regulation challenged in this case must be sustained. It is reasonable in denying a double tax benefit which would result from allowing both the exclusion of the reimbursement and the deduction of the identical travel expense. It harmonizes with the language of the statute, when examined in the light of the objective that Congress sought to achieve. A contrary result is attainable only through an ingeniously contrived interpretation of the statute that produces a result that is at war with commonsense and is inconsistent with the manifest design of the legislation. We so hold, regardless of whether we should give more than "customary deference" to the regulation since it is specially authorized by section 911(d)(8), and regardless of whether the regulation should be considered to be interpretative or legislative in character. It is valid no matter how it is classified. To hold otherwise would be to do violence to the statutory scheme.

Petitioner contends finally that the regulation must in any event be declared invalid because of its retroactive application. The tax year before us is 1983, and the regulation, although publicly announced as a "proposed" regulation on July 20, 1983, 48 Fed. Reg. 33,007 (1983), was not finally approved by the Secretary, as we noted *supra,* p. 122, until December 1984 and published as such in the

Federal Register in January 1985. The same effective date—all taxable years "beginning after December 31, 1981"—appeared in both the proposed and final regulations.

The Code itself deals specifically with the matter of retroactive regulations and rulings. On this subject, section 7805(b) provides:

SEC. 7805(b). RETROACTIVITY OF REGULATIONS OR RULINGS.—.The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

The Code thus plainly contemplates that every regulation is to operate retroactively except to the extent that the Secretary provides that it shall be applied without retroactive effect. Petitioner has contended that the regulation in controversy, sec. 1.911-6(b)(1), is an interpretative regulation, and we are inclined to agree. Thus, if the interpretation of the statute embodied in the regulation is correct, one must conclude that the statute has meant the same thing all along, with or without the regulation. Such is plainly the basis for section 7805(b), which merely gives the Secretary the authority to establish an exception to the general rule in the case of any specific regulation or ruling. This has been well established for many years. In *Pollack v. Commissioner*, 47 T.C. 92, 110 (1966), affd. 392 F.2d 409, 411 (5th Cir. 1968), we said:

It is clear therefore, that unless the Commissioner otherwise specifies, regulations are retroactive to the date on which the statute was enacted. *Dixon v. United States*, 381 U.S. 68, 72-75; *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 183-184; *Helvering v. Reynolds*, 313 U.S. 428; *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134-135. * * *

See also *Exel Corp. v. United States*, 451 F.2d 80, 84-85 (8th Cir. 1971); *Estate of Lumkin v. Commissioner*, 474 F.2d 1092, 1096 n. 11 (5th Cir. 1973).

In this case the Secretary did exercise his discretion to a limited extent by providing that the new regulations would be effective for the tax years "beginning after December 31, 1981". See 1985-1 C.B. 224. We thus have here limited retroactivity beginning with the year 1982. Whether the Secretary should have exercised his discretion further to

provide for complete nonretroactivity is the question that we must answer. Section 7805(b) certainly gives him the authority to provide, if he so chooses, that the new regulation will operate only prospectively. And it has been well established that his failure to do so will result in the invalidity of the retroactive application only if such failure is unreasonable or amounts to an abuse of discretion. "The Commissioner's action may not be disturbed unless, in the circumstances of this case, the Commissioner abused the discretion vested in him by sec. 3791(b) of the 1939 Code [predecessor to section 7805(b) of the 1954 Code]". *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 184 (1957).[10]

The most that can be said in petitioner's favor on this aspect of the case is that there was a 1975 revenue ruling involving (in "Situation (3)") an American citizen, employed by a domestic employer to work in a foreign country, who was reimbursed by his employer for his moving expenses back to the United States to work for a different employer. Rev. Rul. 75-84, 1975-1 C.B. 236. The ruling was to the effect that the moving expenses are deductible under section 217. Passing the question whether the ruling did cover a situation like the present since petitioner returned to the United States to work for IBM, not for a different employer, the ruling could not prevent the Secretary from rejecting it in a formally promulgated regulation where the ruling was inconsistent with the statute. In such circumstances, giving retroactive effect to the new regulation was not an abuse of discretion. Cf. *Automobile Club of Michigan,* 353 U.S. at 185-186; *Dixon v. United States,* 381 U.S. 68, 75-80 (1965).

It is now hornbook law that a revenue ruling does not have the same status as a regulation. And, irrespective of whether one views it as no more than a statement of the position of one of the parties, it could hardly be regarded as a bar to correction by a regulation for all open tax years. There is no showing whatever that petitioner relied upon

---

[10]See also *Wendland v. Commissioner,* 739 F.2d 580, 581 (11th Cir. 1984), affg. 79 T.C. 355 (1982); *Redhouse v. Commissioner,* 728 F.2d 1249, 1251 (9th Cir. 1984), affg. 79 T.C. 355 (1982); *Wilson v. United States,* 588 F.2d 1168, 1172 (6th Cir. 1978); *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 979 (5th Cir. 1977); *Chock Full O'Nuts Corp. v. United States,* 453 F.2d 300, 302 (2d Cir. 1971).

this ruling in accepting reimbursement of his expenses from his employer. Moreover, although the proposed regulation, published in July 1983 (prior to petitioner's return to this country), did not have any legal effect until finally adopted, it was not a complete nullity. It in fact gave "warning of things to come". *United States v. Fenix & Scisson, Inc.*, 360 F.2d 260, 267 (10th Cir. 1966). Cf. also *Dixon v. United States*, 381 U.S. 68, 75 (1965) (forecast in a General Counsel Memorandum). Thus, regardless of its legal effect, the existence of the proposed regulation did represent a fact that could well be given some weight in determining whether retroactivity of the final regulation to petitioner's 1983 tax year was arbitrary. As we have construed the statute in the earlier part of this opinion, the revenue ruling was inconsistent with the statute. It could not serve to prevent the Secretary from requiring that a correct interpretation of the statute, reflected in the regulation, be applied to all open tax years. Such would not be an abuse of discretion on his part, and would plainly not be unreasonable here when all that the regulation did was assure that the taxpayer would enjoy one, not two, tax benefits from his moving expenses.

The result that we reach in respect of retroactivity is wholly consistent with the recent opinion of this Court in *Addison International, Inc. v. Commissioner*, 90 T.C. 1207 (1988). By reason of its unusual set of facts, that case is sharply to be distinguished. That case involved a Domestic International Sales Corp. (DISC). After the enactment of highly complicated statutory provisions relating to DISCs, the Treasury issued a handbook for DISCs purporting to contain a "plain language" explanation of the law. That handbook contained a commitment to DISCs that in effect assured them that they could rely upon it until the rules explained therein were modified "in regulations or other Treasury publications". And the handbook further stated that any modification adverse to them would be applied only prospectively. In the light of this unusual situation, the Court in substance concluded that the new regulations promulgated thereafter represented a breach of the promise or commitment in the handbook notwithstanding that the provisions of the new regulations under attack had previ-

ously appeared in proposed regulations. Accordingly, the Court felt that the failure to make the new final regulations prospective only was an abuse of discretion. No such extraordinary situation is present here, and we adhere to the general rule that the regulation under review must be sustained as promulgated. There was no breach of any commitment in this case, nor was there any abuse of discretion.

*Decision will be entered for the respondent.*